[No. F043531. Fifth Dist. June 17, 2004.]

JASON FARRIS et al., Plaintiffs and Respondents, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and Appellant.

674

## Counsel

Lombardi, Loper & Conant, Ralph A. Lombardi and Lori A. Sebransky for Defendant and Appellant.

Wilkins, Drolshagen & Czeshinski and James H. Wilkins for Plaintiffs and Respondents.

## Opinion

**DIBIASO, Acting P. J.**—This is an appeal from the trial court's postremand order denying the motion by appellant Fireman's Fund Insurance Company (FFIC) to disqualify Attorney James H. Wilkins and the law firm of Wilkins, Drolshagen & Czeshinski (WDC).[1] FFIC moved to disqualify Wilkins under

---

[1] Appellant has filed a companion petition for writ of mandate (case No. F043493) and has requested that we take judicial notice of the pleadings and exhibits filed in that original proceeding. We grant the request. In addition, we take judicial notice of this court's opinion in *Jason Farris et al. v. Fireman's Fund Insurance Company*, (Oct. 31, 2002, F039468, F039471 [nonpub. opn.] (*Farris I*)). (Evid. Code, § 452, subd. (d).) Most of the facts presented by the instant record are undisputed. The controversy centers principally on the legal significance of the undisputed facts. Those facts that are disputed are noted. We resolve all factual disputes in favor of respondents. (See *People v. Rayford* (1994) 9 Cal.4th 1, 23 [36 Cal.Rptr.2d 317, 884

Rules of Professional Conduct, rule 3-310(E),[2] on the ground he had formerly represented FFIC while a member of the law firm of McCormick Barstow Sheppard Wayte and Carruth, LLP (McCormick) and, as a result, had access to confidential information material to this action. Wilkins represents respondents Jason Farris (doing business as Creative Fun and Fitness), Renee Magee, Julie O'Keefe and Katherine O'Brien in this lawsuit for alleged bad faith and breach of an insurance contract issued by FFIC. Respondents' complaint asserted that FFIC wrongfully failed to provide benefits under the insurance contract and wrongfully denied coverage by failing to defend Farris in a personal injury action brought by Magee, O'Keefe and O'Brien after they were injured in April 1997 while using an inflatable slide owned by Farris.

■ We hold that *Jessen v. Hartford Casualty Insurance Company* (2003) 111 Cal.App.4th 698 [3 Cal.Rptr.3d 877] (*Jessen*) compelled the trial court, on the record before it, to grant FFIC's motion to disqualify Wilkins. Accordingly, we reverse and remand with directions.

## I.

### A.

The complaint in the personal injury action was filed in December 1997. In 1998, Farris assigned his rights and claims against FFIC to Magee, O'Keefe and O'Brien, and consent judgments were entered against Farris in 1998.

Farris procured the FFIC policy through a California insurance agent working with Allied Specialty Insurance, a Florida entity. The coverage dispute centered on whether Farris had properly added the slide to the FFIC policy prior to the accident that generated the personal injury action. Farris said the equipment was added and that he had paid the necessary additional premiums. FFIC claimed the equipment had not been added. FFIC's third party administrator, All Risk Claims Services, another Florida entity, handled the claims filed by Magee, O'Keefe and O'Brien.

P.2d 1369] [rules of appellate review require that evidence be viewed in the light most favorable to the respondent].)

[2] An attorney cannot, "without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." (Rules Prof. Conduct, rule 3-310(E).)

## B.

McCormick represented FFIC for 13 years in coverage matters. As FFIC's coverage counsel, the firm issued formal coverage opinions, gave informal advice, consulted on coverage matters, and handled the litigation of coverage disputes and bad faith cases. Wilkins was hired as an associate at McCormick in 1984 and became a partner in 1990. He left the firm to start WDC in October 1997. During his entire tenure at McCormick, Wilkins worked as key member of the firm's insurance coverage department.

While at McCormick, Wilkins gave coverage and claims handling advice to senior employees and decision makers at FFIC, including Director of Special Investigations, Wayne Falsetto, former Litigation Manager and current Claims Technical Advisor, Bruce Gibson, Senior Litigation Specialist, James Bracken, and General Adjuster South West Division, Anna Torres.[3] According to these individuals, during Wilkins's representation of FFIC he discussed settlement, litigation and claims handling strategies in connection with coverage matters, and participated in confidential communications with top-level FFIC employees. Wilkins handled 226 files for FFIC (27 percent of all FFIC files handled by the McCormick firm) between 1987 and 1997. In order to do his job properly, Wilkins was required to have thorough knowledge of FFIC policies and procedures with respect to policy interpretations and coverage positions. When discussing strategies for dealing with files in which coverage was at issue, attempting to avoid exposure to bad faith claims was a paramount concern. Wilkins was a presenter in educational seminars given to FFIC employees on issues related to coverage disputes and bad faith actions.[4]

Wilkins did not directly deny any of these facts,[5] but took the position that the bulk of his work for FFIC while at McCormick was issuing coverage opinions, which he said consisted of applying the facts and circumstances of

---

[3] Bruce Gibson was responsible for overseeing the progress and resolution of all insurance defense cases and coverage dispute litigation. Wayne Falsetto made the final decisions regarding liability for coverage issues, including approving all decisions between 1996 and 1997 to deny coverage. James Bracken is a senior FFIC official and is the claims adjustor responsible for handling this action. When Wilkins started WDC, he met with Bracken and solicited FFIC's business.

[4] The trial court believed the educational presentations probably did not contain confidential information and were similar to those presented at most continuing education courses. In fact, the record established that FFIC looked to the firm and its experienced attorneys for guidance and education related to coverage issues, including protecting against bad faith litigation. In addition, an educational seminar presented to lawyers for the purpose of instruction about a particular area of the law is materially distinct from an educational seminar presented to client representatives for the purpose of guiding the client's action in a particular area of the law.

[5] Wilkins stated he never consulted or discussed or otherwise provided any advice to FFIC on Farris's tender. FFIC does not contend otherwise. This is not a "switching sides" case.

a case to the particular terms and provisions of the policy in issue. Wilkins characterized this as a "very factual and legally specific" analysis. He confirmed he had routinely discussed coverage work with other attorneys in the firm, but said he did so only in the context of specific claims, facts and policies. He admitted representing FFIC to a "much more limited extent" in declaratory relief actions brought to resolve coverage disputes, but also said these were limited to specific facts and particular policy provisions unrelated to the Farris claim. He further acknowledged, to an "even more limited extent," representing FFIC on a "few occasions" in bad faith litigation, and stated that his involvement in such matters was restricted to the analysis of the facts and circumstances particular to the specific claim. Wilkins said he had no knowledge of FFIC litigation or discovery strategies or procedures for handling bad faith claims, nor any knowledge about FFIC that would be of any value to him in handling the *Farris* case.

### C.

This case has previously been before this court. In an opinion filed on October 31, 2002, we reviewed an earlier denial of a motion to disqualify Wilkins and WDC. We reversed the order, finding that the trial court had misapplied the law when it found no substantial relationship between the former and current representation "because [the court's] attention was narrowly directed to the particular allegations involved in the two representations." (*Farris I.*) We remanded, directing the trial court to rehear the motion and apply the correct standard. After the hearing on remand, the trial court issued a lengthy statement of decision in which it again denied FFIC's motion to disqualify, finding there had been "no showing that the services performed by Wilkins as a 'coverage' attorney for Fireman's Fund years ago are substantially related to the services that a litigator/trial lawyer would perform defending a bad faith action."

FFIC maintains on this appeal that the trial court failed to apply the correct legal standards and that its findings are not supported by substantial evidence.

### II.

### A.

■ Since this court's unpublished opinion in *Farris I*, we have explained in a published opinion the legal principles that govern in successive representation cases such as this one. In *Jessen v. Hartford Casualty Insurance Company, supra,* 111 Cal.App.4th 698, we held that, "when ruling upon a disqualification motion in a successive representation case, the trial court must first identify where the attorney's former representation placed the

attorney with respect to the prior client. If the court determines that the placement was direct and personal, this facet of *Ahmanson* is settled as a matter of law *in favor of disqualification* and the only remaining question is whether there is a connection between the two successive representations, a study that may not include an 'inquiry into the actual state of the lawyer's knowledge' acquired during the lawyers' representation of the former client." (*Jessen, supra,* at p. 710, citing *H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1453 [280 Cal.Rptr. 614] (*Ahmanson*), italics added.)[6]

Here, it is undisputed that Wilkins's relationship with FFIC was personal and direct. Wilkins acted as a coverage attorney for FFIC for 13 years and actively participated, through personal contacts with key FFIC employees, in the representation provided by the McCormick firm to FFIC with respect to coverage and bad faith cases. He was an experienced and valued coverage attorney for McCormick, personally responsible for 27 percent of the work FFIC sent to McCormick from 1984 to 1997.

■ Because Wilkins's representation of FFIC was direct, the only issue before the trial court was whether there was a substantial relationship between what Wilkins did for FFIC during the years he represented FFIC and what Wilkins seeks to do for Farris. (*Jessen, supra,* 111 Cal.App.4th at p. 710.) Successive representations will be substantially related "when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." (*Id.* at p. 712.)

■ There is no reason to reconsider *Jessen*. First, the test articulated in *Jessen* does no violence to the *Ahmanson* formula, which requires two separate inquiries in determining whether an attorney ought to be disqualified in a successive representation case—the nature of the relationship between the former representation and the current representation and the nature of the attorney's past relationship with the former client. (*Ahmanson, supra,* 229 Cal.App.3d at p. 1453.) *Jessen* does not focus solely upon the nature and extent of the attorney's involvement in the compared representations by detaching from the necessary analysis the factual and legal issues involved in the representations. To the contrary, when the attorney's contact with the client in the first representation was direct, the *Jessen* evaluation of whether the two representations are substantially related centers precisely upon the factual and legal similarities of the two representations. (*Jessen, supra,* 111

---

[6] When it heard the motion to disqualify, the trial court had a copy of *Jessen* before it.

Cal.App.4th at pp. 709–710.) When the attorney's contact with the client in the first representation was not direct, the *Jessen* evaluation of whether the two representations are substantially related involves consideration of the factual and legal similarities of the representations as well as the nature of the attorney's past relationship with the former client. (*Id.* at pp. 710–711; *Ahmanson, supra,* 229 Cal.App.3d at p. 1454; Rest. 3d., Law Governing Lawyers, § 132, com. h.; see Wolfram, *Former Client Conflicts,* (1998) 10 Geo. J. Legal Ethics 677, 733–735 [peripheral representation] (Wolfram).) These criteria are perfectly consistent with *Ahmanson.*

■ Second, *Jessen* did not adopt the so-called playbook approach. (See Rest.3d. Law Governing Lawyers, § 132, com. d(iii), pp. 379–380; Wolfram, *supra,* at p. 723 ) To create a conflict requiring disqualification, *Jessen* mandates that the information acquired during the first representation be "material" to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation. (*Jessen, supra,* 111 Cal.App.4th at pp. 712–713; Wolfram, *supra,* at p. 724 [only "when such information will be directly in issue or of unusual value in the subsequent matter will it be independently relevant in assessing a substantial relationship"].) Thus, for example, the attorney's acquisition during the first representation of general information about the first client's "overall structure and practices" would not of itself require disqualification unless it were found to be "material"—i.e., directly in issue or of critical importance—in the second representation. (See *SLC Ltd v. Bradford Group West* (10th Cir. 1993) 999 F.2d 464, 467–468 [financial information].) The same is true about information such as the first client's "litigation philosophy" or "key decision makers." Our reference to these and other factors in *Jessen* did not establish any one of them, singly or in any particular combination, as a litmus test; we simply identified some of the categories of information that might be found to be "material" and therefore relevant to a determination whether the attorney ought to be disqualified. ■ For these reasons, we do not regard *Jessen* as creating a lifetime prohibition against representation adverse to a former client, treating the former client in the same fashion as a current client, or automatically mandating disqualification where the two compared matters are entirely unrelated.

■ We perceive no substantial difference between the *Jessen* formulation and that found in section 132 of the Restatement Third of the Law Governing Lawyers (2002), which provides in relevant part that the present representation will be deemed to be "substantially related" to the prior representation if (1) the present representation "involves the work the lawyer performed" during the prior representation, or (2) "there is a substantial risk that [the present representation] will *involve the use of information acquired in the course of* [the prior representation], unless that information has become generally known." (Rest. 3d, Law Governing Lawyers, § 132, italics added.)

Significantly, the Restatement, like *Jessen*, incorporates a materiality element into the test; the comment accompanying section 132 explains that there exists a "substantial risk" the present representation will involve the use of information acquired during the prior representation "where it is reasonable to conclude that it would *materially* advance the [present] client's position in the subsequent matter to use confidential information obtained in the prior representation." (Rest. 3d, Law Governing Lawyers, § 132, com. d(iii), italics added.) We do note that section 132 uses only the word "information," but the corresponding comment d(iii) adds the qualifier "confidential" to the statement. (Rest. 3d., Law Governing Lawyers, § 132, com. d(iii) [substantial relationship exists "if there is a substantial risk the subsequent representation will involve the use of confidential information of the former client obtained in the course of the representation . . . ."].) Because the critical concern is the possibility of use in the second representation of confidential information acquired during the first representation, we will make clear now that the "information" addressed by the *Jessen* formulation, like the "information" addressed by the Restatement formulation, is "confidential" information. Thus, the inquiry under *Jessen* focuses "upon the general features of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation." (Rest.3d, Law Governing Lawyers, § 132, com. d(iii); see *Koch v. Koch Industries* (D. Kan. 1992) 798 F.Supp. 1525, 1536 [the proofs on a motion to disqualify counsel in a subsequent representation case should enable the court "to reconstruct the attorney's representation of the former client, to infer what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client"]; *Trone v. Smith* (9th Cir. 1980) 621 F.2d 994, 999; Wolfram, *supra*, 10 Geo. J. Legal Ethics at pp. 716–718.)[7]

## B.

The trial court found that the services performed by Wilkins for FFIC were not "substantially related to the services that a litigator/trial lawyer would perform defending a bad faith action." However, it is not the services performed by the attorney that determines whether disqualification is required, it is "the similarities between the legal problem involved in the former representation and the legal problem involved in the current representation." (*Jessen, supra,* 111 Cal.App.4th at p. 709.) The test has never been the identity of the specific tasks the attorney was asked to perform in either representation. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*) [the question is whether the *subjects* of

---

[7] We again highlight the impropriety of any inquiry into, or evidence about, the "actual state of the lawyer's knowledge" (*Ahmanson, supra,* 229 Cal.App.3d at p. 1453) in evaluating whether there is a substantial relationship between the compared representations.

the prior and current relationship are the same]; *Ahmanson, supra,* 229 Cal.App.3d at p. 1453 [the question is whether the *subject matters, facts or issues* are substantially the same].) Whether an attorney, for example, drafts a contract or provides an opinion letter is irrelevant if the legal problem motivating the service in the former representation is substantially related to the legal problem motivating the service provided in the subsequent representation. (See *Oxford Systems, Inc. v. Cellpro, Inc.* (E.D.Cal. 1999) 45 F.Supp.2d 1055, 1061 [although the nature of the work done by the attorney is a factor to consider, it is not determinative].) The ethical rules recognize that the interest of the former client is to ensure "permanent confidentiality of matters disclosed to the attorney in the course of the prior representation." (*Flatt, supra,* 9 Cal.4th at p. 283.) ■ An attorney who, in the former representation of an insurance company, prepared a form of insurance policy for the company's use cannot in the second representation sue the insurance company for a breach of that policy on behalf of a person to whom a form of the policy was subsequently issued. (See Rest. 3d, Law Governing Lawyers, § 132, subd. (1) and com. d(ii).) Though the services are distinct, the representations are substantially related because they both center on the terms and conditions of the single policy form which was the handiwork of the lawyer.

Wilkins does not dispute that he did substantial work on coverage matters for FFIC during his tenure at McCormick. He provided ongoing legal advice on coverage issues to key FFIC decision makers in more than two hundred coverage claims over an extended period of time and also provided general guidance to those decision makers concerning claims handling and policy interpretation questions. (See *Gray v. Commercial Union Ins. Co.* (1983) 191 N.J. Super. 590 [468 A.2d 721, 725–726].) He developed direct, personal relationships with key decision makers. He had a privileged viewpoint from which to observe, and in fact direct or guide, how FFIC handled particular claims and made coverage decisions internally. He was privy to, and a part of, the decision-making process undertaken before FFIC accepted or denied coverage. He was privy to, and a part of, the decisionmaking process undertaken when FFIC settled a coverage dispute rather than litigate it.[8]

---

[8] Wilkins takes the position on appeal that the trial court resolved in his favor the factual issues relating to his knowledge of FFIC's coverage practices. We disagree. The trial court did not make any such findings. It simply noted that Wilkins's evidentiary showing was tailored toward the substantial relationship test rather than toward his present use against FFIC of confidential information about the insurer. FFIC submitted numerous declarations from key decision makers stating that they had discussed with Wilkins FFIC practices, including litigation and settlement strategies, in *coverage* matters. Wilkins never directly disputed this evidence; he never denied the conversations took place. Instead, he stated pointedly that he was not "involved with the development, or otherwise aware of any litigation or discovery strategies or procedures" for handling *bad faith cases.* This appears to be a tacit admission that he did discuss strategies in coverage disputes. Thus, any finding by the trial court must be

Wilkins asserts nonetheless that this information would be of absolutely no value to him in this action.[9] We find this claim disingenuous at worst and naive at best. In any event, whether he actually possesses confidential information that would work to his advantage in his current representation is not the test. Rather, the test is whether a substantial relationship exists between the subjects of the two compared representations.[10] (*Flatt, supra,* 9 Cal.4th at p. 283 [access to confidential information in the first matter, relevant by definition when the subjects are substantially related, is presumed and disqualification is mandatory]; Rest.3d, Law Governing Lawyers, § 132, com. d(iii); Wolfram, *supra,* 10 Geo. J. Legal Ethics at pp. 716–718.)

## C.

We also believe the trial court applied the incorrect standard when it found no substantial relationship between the former and current representations because the claims handled by Wilkins at McCormick were not factually similar to those filed here. In particular, the court said, "In fact, the claims were submitted after Farris was sued in 1998." This again misapprehends the nature of a "substantial relationship." (*Jessen, supra,* 111 Cal.App.4th at p. 712; see also *Trone v. Smith, supra,* 621 F.2d at p. 999 [if there is a reasonable probability that confidences were disclosed which could be used against the client in a later representation, a substantial relationship between the two cases would be presumed]; *Gray v. Commercial Union Ins. Co., supra,* 468 A.2d at p. 725 [if the prior representation was of a type that would give the appearance that the lawyer learned and has reason to disclose his former client's confidences, the lack of identity between the cases will not pose a barrier to disqualification]; Rest. 3d, Law Governing Lawyers, § 132, subd. d(iii).)

---

limited to bad faith actions, not coverage matters generally. Further, we find it hard to believe that Wilkins was not exposed to FFIC's policies in bad faith cases. Wilkins admitted representing FFIC in more than one bad faith action ("on a few occasions"), which likely made him aware of FFIC's approach to bad faith actions. Thus, we question whether a finding limited to bad faith cases would be supported by substantial evidence. Nevertheless, our decision does not turn on whether Wilkins was aware of FFIC's methods employed in the defense of bad faith actions. We believe the extensive knowledge derived from his pervasive representation in coverage disputes requires disqualification, for the reasons stated in this opinion.

[9] Wilkins told the court in the first hearing on the motion to disqualify, prior to remand, "I'm sure I had confidential information with Fireman's Fund about the coverage opinions that I gave them. . . . I'm not aware of any confidential information that I ever obtained from Fireman's Fund that I can use against Fireman's Fund in this case."

[10] The trial court asked at the hearing "what knowledge is [Wilkins] really going to have that's going to give him any undue or unfair advantage in this present litigation against Fireman's Fund?" The trial court was in essence asking FFIC to reveal the specific confidential information that Wilkins had in his possession that could be used to FFIC's disadvantage in this case. As we articulated in *Jessen,* this type of inquiry is outlawed. (*Jessen, supra,* 111 Cal.App.4th at p. 710.)

 Wilkins advised and assisted FFIC in making coverage decisions when he acted as FFIC's California coverage counsel. An insurer's acceptance or denial of coverage necessarily raises legal issues about whether the insurer conducted an adequate investigation, whether the insurer gave sufficient consideration to the interests and expectations of the insured, whether the insurer reasonably construed and applied the relevant policy language, and whether the insurer's construction and application of the relevant policy language was consistent with its treatment of other similarly situated insureds. (See generally 2 Cal. Insurance Law & Practices (Matthew Bender, 2003) ch. 13, Claims Handling and the Duty of Good Faith, pp. 13-1 to 13-125; see *id.* at p. 13-14 [covenant of good faith and fair dealing is not consensual but is imposed by law].) A coverage attorney's responsibility to his client includes advising the client on these subjects. (See generally 1 Cal. Liability Insurance Practice: Claims & Litigation (Cont. Ed. Bar 2003) §§ 10.13, 10.14 [insurer often consults with coverage counsel for an opinion on whether coverage is owed and to help develop response to tender of defense; advice from coverage counsel that denial of coverage is legally proper is at minimum evidence of reasonable basis for denying claim and may be defense in bad faith action]; Kornblum et al., Cal. Practice Guide (The Rutter Group 1986) §§ 10:94–10:108, pp. 10-28 to 10-31.2 [insurer's reliance on advice of counsel may be defense in bad faith actions].)

 Coverage disputes are substantially related to bad faith actions for the purpose of attorney disqualification because they both turn on the same issue—whether or not there is coverage under the terms of the policy. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619] [a bad faith case is at base a coverage case, because without coverage there can be no bad faith]; *Hameid v. National Fire Ins. of Hartford* (2003) 31 Cal.4th 16, 21 [1 Cal.Rptr.3d 401, 71 P.3d 761] [liability insurers owe a duty to defend their insureds for claims that potentially fall within the policy's coverage provisions; if no claim is even potentially covered, the insurer owes no duty to defend].)

The present lawsuit raises these identical legal issues, in either the contract or bad faith cause of action or both. In part, the complaint alleges illegal claims handling practices and underwriting policies.[11] In addition, there is a common empirical connection between what Wilkins did for FFIC and what he is attempting to do for respondents now. Though in the last analysis the outcome in this lawsuit will turn on the particular facts developed at trial measured against the relevant law, the critical evidentiary inquiry into FFIC's actions in investigating and coming to a decision on Farris's claim for benefits will necessarily include an assessment of FFIC's internal claims and coverage policies and practices, in general and with respect to all

---

[11] Respondents' fraud causes of action assert generally that FFIC treated Farris differently than FFIC treated other, similarly situated insureds.

comparably-placed insureds. With respect to California cases such as this one, Wilkins was instrumental in formulating those strategies and philosophies; in fact, he participated in the training of senior claims personnel of FFIC's California offices about how to handle and decide coverage questions in this state, providing coverage interpretations and claims handling advice relied upon by FFIC to develop, modify, and interpret FFIC's practices, policies and procedures related to coverage questions and disputes.[12]

Furthermore, it is likely that some of the witnesses in this action will be FFIC senior claims personnel who formerly worked closely with Wilkins when he represented FFIC. For example, Sally Coombs[13] was one of the FFIC claims officers who participated in the decision to deny policy benefits to Farris. Wilkins therefore probably will be cross-examining her about, at minimum, the reasons for that decision and its consistency with other coverage decisions participated in by Coombs, perhaps some of which may have been made by Coombs in consultation with Wilkins when he was with McCormick.

## D.

We do not agree with the trial court that, because "much of the information provided to a coverage attorney by the insurer will inevitably be the subject of discovery in a bad faith action," there was no need to disqualify Wilkins. Again, this does not reflect the proper legal standard. Respondents may be entitled to "much of the information" Wilkins had access to as coverage counsel, but respondents are not entitled to have, through discovery or through the mind and experience of Wilkins, the confidential information Wilkins is presumed to have acquired during his prior representation of FFIC. (Evid. Code, § 950 et seq. [attorney-client privilege]; *PSC Geothermal Services Co. v. Superior Court* (1994) 25 Cal.App.4th 1697, 1709 [31 Cal.Rptr.2d 213] [Legislature has specifically recognized the attorney-client privilege by limiting the disclosure of such information before or during trial]; *Aetna Casualty & Surety Co. v. Superior Court* (1984) 153 Cal.App.3d 467, 477 [200 Cal.Rptr. 471] [although insurer's claim files are normally discoverable, attorney-client privilege and work product doctrine may limit otherwise discoverable information].)

---

[12] Wilkins himself sought to profit from his experience when he formed WDC. Wilkins's advertising resume, prepared for submission to prospective WDC clients, stated in relevant part: "[Wilkins's] experience includes providing detailed coverage analysis on all types of insurance policies including . . . commercial general liability [policies]. [He] has also represented many insurance carriers in insurance bad faith claims and otherwise given advice to insurers regarding proper claims handling and procedures."

[13] Wilkins admitted working with Coombs during his former representation of FFIC, although he minimized the contacts.

Nor do we find it significant that the policy purchased by Farris was obtained through Allied Insurance Services, a Florida entity, or that the claims were filed and processed by All Risk Claims Services, also a Florida entity. The policy was issued in California. The claims adjuster assigned to the Farris case, James Bracken, is a key FFIC manager who had extensive contacts with Wilkins when Wilkins represented FFIC.[14] The decision to deny coverage to Farris appears to have been made by Coombs. Moreover, Farris is a California resident whose insured business is in California, the subject injuries occurred in California, the injured parties were California residents and California law applies. Wilkins worked with FFIC personnel in California, advising the company on coverage questions and disputes under California law. His work was monitored by the national office and he was expected to know national corporate standards.[15]

## E.

The trial court expressed concern that, because FFIC is a large nationwide insurance company, a finding that a bad faith action has a substantial relationship with coverage disputes would preclude an attorney who has served as coverage counsel from representing plaintiffs in bad faith actions arising anywhere in the nation against the former client for an indefinite period. First, we note that nothing we said in *Jessen*, nor anything we say here, supports a conclusion that a representational ban, once imposed, would be indefinite. (See Wolfram, *supra*, 10 Geo. J. Legal Ethics at pp. 731–733.) We certainly can envision circumstances where the passage of time might be shown to have eliminated a prior substantial relationship due to such events as changes in corporate structure, turn over in management, and the like. (*Ibid.*) No such event has been shown to have occurred here. The injuries from which this case arose occurred in late 1997. Wilkins left McCormick in October 1997, barely six months before Farris tendered the defense to FFIC in April 1998.

 In addition, we do not comprehend how the application to Wilkins of the principles articulated in *Ahmanson* and *Jessen* produces any greater

---

[14] James Bracken stated he spoke with Wilkins during some periods at least several times a week, sometimes every day. They discussed policies, practices and procedures with respect to insurance coverage matters and claims handling, as well as litigation and settlement strategies in coverage matters.

[15] The March 28, 1991 letter from James Wagoner of McCormick to FFIC personnel identified Wilkins as the coverage team manager for the FFIC Santa Ana office. The letter was copied to the associate director of the FFIC home office in Minneapolis. A November 19, 1993 letter from the national level asked McCormick to help keep the FFIC claims staff updated as to "changes in the legal environment in your jurisdiction." It also asked for any other educational information because FFIC has an interest in "controlling and managing litigation." A seminar presented to FFIC personnel, in which Wilkins participated, was responsive to this request.

hardship than would be suffered if the same principles were applied to any other attorney who has had an equivalent, long-term, direct representational relationship with any national or multinational client. A large multijurisdictional company has no less an interest than any other more modest legal consumer in assuring that confidential information imparted during a representation remains confidential. (*Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 823 [5 Cal.Rptr.3d 442] [in successive representation cases chief fiduciary value jeopardized is client confidentiality].) "The paramount concern is the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." (*Jessen, supra,* 111 Cal.App.4th at p. 705.) Rule 3-310(E) of the Rules of Professional Conduct dictates that attorneys must avoid representation of adverse interests and cannot accept employment adverse to a former client where the attorney has obtained from the prior representation confidential information material to the present employment. We find no exception in this rule for former clients whose national or multinational scope might impinge upon the future employment opportunities of the attorney in question. If employment opportunities are curtailed, the sacrifice is to be borne by the attorney, not by the former client. An attorney who gains confidential information during the representation of a former client, regardless of its identity, simply cannot turn around and use that information, for the benefit of a subsequent client, against the former client in a substantially related matter. Moreover, we doubt that the several carriers Wilkins may have directly represented during his tenure at the McCormick firm comprise the universe of insurance companies that have issued and now issue liability policies in this state. It is unlikely Wilkins will be starved for work on behalf of insureds who wish to bring contractual and bad faith actions against insurers.

### F.

The evidence submitted by FFIC made a prima facie case that the "subject" of Wilkins's prior representation of FFIC and the "subject" of Wilkins's current representation of respondents were "substantially related." Wilkins's declaration, however, did not create a material factual dispute about whether this was indeed the case. The bulk of Wilkins's declaration consisted of two propositions: (1) the work he did for FFIC, including his discussions with other McCormick attorneys, was limited to the specific facts and policy provisions implicated by the particular case or inquiry, and (2) the seminars he presented to FFIC personnel were similar to continuing legal education seminars presented to interested attorneys which provided "generic advice regarding recent developments or common issues in insurance coverage law." However, as we have observed, a "substantial relationship" does not necessarily mean an exact match between the facts and issues involved in the two

representations, and the similarity between the public educational seminars Wilkins provided and those he privately provided FFIC is irrelevant to whether such a relationship existed.[16] As we have also pointed out, Wilkins's declaration failed to materially dispute the evidence in FFIC's moving papers directly relevant to the proper legal question before the trial court. To the extent Wilkins's declaration asserted that he had no access to and did not acquire any confidential information during his tenure at McCormick, it constituted an ineffective "cursory denial" (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1341 [104 Cal.Rptr.2d 116]), in addition to being irrelevant (*Jessen, supra,* 111 Cal.App.4th at p. 710 [where the attorney-client relationship is direct, inquiry into the actual state of the lawyer's knowledge acquired during the former representation is prohibited]).

We emphasize that this opinion does not rest entirely or even in principal part upon Wilkins's prior acquisition of general "playbook" information about FFIC. Instead, it rests primarily upon the evidence of Wilkins's pervasive participation, and indeed his personal role in shaping, FFIC's practices and procedures in handling California coverage claims, practices and procedures that, given the short time span between Wilkins's departure from McCormick and Farris's request for a defense from FFIC, were likely to have been in place when FFIC rejected the tender and thus directly in issue in this case. (Rest. 3d, Law Governing Lawyers, § 132, com. d(iii) [court required to infer whether confidences likely imparted in first representation are material to second representation]; Wolfram, *supra,* 10 Geo. J. Legal Ethics at pp. 726–727.) In this context, the "playbook" information assumes added "importance and pointed relevance." (Wolfram, *supra,* at p. 727; see *Global Van Lines, Inc. v. Superior Court* (1983) 144 Cal.App.3d 483, 488–489 [192 Cal.Rptr. 609] [disqualified lawyer participated in transactions that gave rise to the second representation and had knowledge of policies, attitudes and practices of former client's management]; *Crawford W. Long Memorial Hosp. of Emory University v. Yerby* (Ga. 1988) 258 Ga. 720 [373 S.E.2d 749, 750–751] [lawyer disqualified where current client's claim arose during the period when the lawyer represented the defendant in the same kind of cases—medical malpractice]; *Chugach Elec. Ass'n. v. U.S. Dist. Court* (9th Cir. 1966) 370 F.2d 441, 444 [lawyer disqualified where current client's claims were based upon the defendant company's practices during the period when the lawyer acted as general counsel for the company].)

---

[16] To be precise, Wilkins did not offer the information about the public educational seminars to support his case that there was no "substantial relationship," but offered the information as confirmation of the assertion that the certain "educational coverage seminars" Wilkins presented to FFIC personnel "were very similar" in content to the public seminars. That the FFIC seminars were "very similar" to the public seminars does not refute FFIC's evidence that the content of the FFIC seminars consisted in part of confidential legal advice.

For these reasons, we conclude that the trial court abused its discretion in denying the motion to disqualify Wilkins and the WDC firm.[17] (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra* 20 Cal.4th at pp. 1143–1144 [we review the trial court's decision on a motion to disqualify under the familiar abuse of discretion standard]; *McPhearson v. Michaels Co.* (2002) 96 Cal.App.4th 843, 851 [117 Cal.Rptr.2d 489] [trial court abuses its discretion when it applies wrong legal standard].)

## DISPOSITION

The judgment (order) is reversed. The trial court shall on remand enter a new order granting FFIC's motion to disqualify Wilkins and WDC. Costs on appeal are awarded to FFIC.

Vartabedian, J., and Dawson, J., concurred.

---

[17] The parties spend little time addressing the need to disqualify the WDC firm. The record establishes that both Wilkins's partners, John Drolshagen and Michael Czeshiniski, were also former McCormick partners who represented FFIC as insurance defense counsel. Whether this work is substantially related to Wilkins's current representation of Farris is irrelevant in light of our conclusion that Wilkins's former representation of FFIC requires disqualification here. If Wilkins is disqualified because he is presumed to have confidential information adverse to FFIC, the entire WDC firm must be disqualified absent some showing that an ethical shield has been created. (ABA Model Code of Prof. Responsibility, DR5-105(D); *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1153 [86 Cal.Rptr.2d 816, 980 P.2d 371] [where attorney is disqualified due to ethical conflict, disqualification extends to entire firm]; *Adams v. Aerojet General Corporation, supra,* 86 Cal.App.4th at p. 1329 [knowledge by any member of a law firm is knowledge by all attorneys in the firm].) No such showing appears in this record.