Filed 6/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VICTAULIC COMPANY, Plaintiff and Respondent, v. AMERICAN HOME ASSURANCE COMPANY et al., Defendants and Appellants. | A163396 (Alameda County Super. Ct. No. RG12642929) |

For some 10 years Victaulic Company (Victaulic) and three of its insurers, members of the American Insurance Group (AIG), have been engaged in litigation.  One case is this lawsuit filed by Victaulic in late 2012; in 2013, the law firm of Pillsbury, Winthrop, Shaw, Pittman, LLP (Pillsbury or the Pillsbury firm) substituted in as counsel for Victaulic, and has represented it since—a lawsuit that has been vigorously contested.  That activity has included Victaulic's success on summary adjudication; success on a court trial for declaratory relief finding a duty to defend and a duty to indemnify; and success on a three-and-a-half-week jury trial for bad faith and punitive damages resulting in a judgment of some $56 million.  In 2018, we reversed the judgment due to a combination of errors by the trial judge.

Following remand, Victaulic filed an amended complaint, and the vigorous litigation continued.  In 2021 the insurers learned that two attorneys who had done work for a claims-handling arm of AIG had recently

joined the Pillsbury firm, some six years after they left employment at the earlier firm.  The insurers filed a motion to disqualify the lawyers and the Pillsbury firm, a motion that generated thousands of pages of pleadings, declarations, and exhibits, and two hearings.  Following all that, the trial court entered a comprehensive 16-page single-spaced order that, analyzing in detail the evidence before it and citing and applying the law, denied the motion, concluding that the insurers failed to meet their burden in several particulars.

The insurers appeal, arguing that the trial court "committed a series of legal errors," that its ruling "rested entirely on numerous errors of law," and thus the two attorneys "must be disqualified" due to their representations in "substantially related matters," and "because the attorneys' conflict must be imputed to their firm, [Pillsbury] must also be disqualified."  We reject the arguments, and we affirm.

## BACKGROUND

### *The Parties and the General Setting*

This is the second appeal in this lawsuit, the first of which resulted in our opinion in *Victaulic Co. v. American Home Assurance Co.* (2018) 20 Cal.App.5th 948 (*Victaulic*).  Both briefs refer to the opinion for some of the background facts, as do we, taking judicial notice of it on our own motion.

And as to how the facts are to be set forth, they must be in favor of Victaulic, the prevailing party below.  (*Farris v. Fireman's Fund Insurance Co.* (2004) 119 Cal.App.4th 671, 675, fn. 1 (*Farris*).)  As the court put it in *H.F. Ahmanson & Co. v. Salomon Bros.* (1991) 229 Cal.App.3d 1445 (*Ahmanson*):  "In our review of disqualification motions, as elsewhere, the judgment of the lower court is presumed correct, and all intendments and presumptions are indulged to support it on matters as to which the record is

2

silent. [Citation.] Conflicts in the declarations are resolved in favor of the prevailing party and the trial court's resolution of factual issues arising from competing declarations is conclusive on the reviewing court. [Citations.]" (*Id*. at p. 1451.)

Appellants are three insurance companies: American Home Assurance Company (American Home), Insurance Company of the State of Pennsylvania (ICSOP), and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), which will usually be referred to collectively as defendants or the insurers. All three companies are members of the AIG. Another entity involved as a participant here, though not a party, is AIG Claims. Yet another is AIG Claims, Inc.

Respondent is Victaulic, a producer of mechanical pipe joining systems, headquartered in Pennsylvania, a global company with major facilities that manufacture over 60,000,000 units per year, and employs 3,600 employees worldwide. As one insurance underwriter described Victaulic, "it is 'one of the world's leading developer[s] and producer[s] of unique mechanical pipe coupling systems. They manufacture pipe couplings, fittings, valves, custom ductile iron castings and plastic piping systems. . . . Victaulic products are now in use worldwide for a variety of industrial, commercial, and institutional uses including heating, air conditioning, fire protection including sprinkler heads, mining, maritime, oil field, municipal treatment and automotive.' "

This case arose out of nine specific claims against Victaulic that resulted in lawsuits against it, which claims were tendered for defense to one or more of the insurers, claims that came to be handled by AIG Claims, with Nancy Finberg, a senior claims examiner handling most of them.

3

The first of the claims was a lawsuit in Oregon referred to as the "Elizabeth claim." The other eight claims included three other cases in Oregon (one called Edge), one case in California (called Essex), and cases in Washington, Colorado, West Virginia, and Massachusetts.

The Elizabeth claim alleged that rubber on a Victaulic plumbing component installed in a condominium complex was deteriorating, causing black specks to appear in the water. Responding to Victaulic's "request for coverage," on June 21, 2012, Keith Taylor, an assistant vice president at AIG Claims, wrote a letter with what he called AIG's "coverage position." The letter summarized the underlying complaint, set forth in four pages various bases for excluding or denying coverage, and concluded that AIG was reserving "all rights under the policies."

Oregon attorney Anne Cohen had been retained to defend Victaulic in the Elizabeth claim. And on June 21, Taylor telephoned Cohen to advise that "AIG had filed a lawsuit against Victaulic," a reference to a declaratory relief lawsuit AIG had filed in Pennsylvania.

### The Lawsuits

In June 2012, the insurers filed a declaratory relief action in Pennsylvania, Victaulic's headquarters, and also the home state of National Union and ICSOP. The Pennsylvania action, which came to be referred to as PA1, sought a declaration as to whether three of the claims—Elizabeth, Edge, and Essex—involved "property damage" caused by an "occurrence," and whether any of the damages were excluded as business risks. The basis for PA1 was the opinion in *Kvaener Metals v. Commercial Union Ins.* (2006) 589 Pa. 317, holding that claims of faulty workmanship are not covered "occurrence[s]." PA1 was ultimately dismissed by court order on December

4

31, 2013, on the basis that the third-party claimants were indispensable parties under Pennsylvania law, and not amenable to jurisdiction there.

In August 2012, Victaulic filed this action in California, alleging that defendants had breached their duty to defend the Elizabeth, Edge, and Essex claims, forcing Victaulic to pay substantial sums to defend itself. The complaint alleged claims for breach of contract, bad faith, intentional misrepresentation, and declaratory relief. The insurers sought to dismiss or stay the California action on the basis of the Pennsylvania action, but were unsuccessful.

In July 2013, the Pillsbury firm substituted in as counsel for Victaulic, and has been its counsel to this day.

In December 2013, the insurers filed a cross-complaint seeking a declaration they did not owe payments for seven of the claims. Victaulic later obtained leave to add two other claims, so all nine claims were now involved in the action.

In May 2014, Victaulic filed a second amended complaint (SAC). In light of the fact that defenses were being provided, Victaulic alleged that the insurers should be liable for "failing to acknowledge their duty to defend Victaulic, meaningfully participate in the defense or settlement of claims, acknowledge coverage for and/or pay covered settlements in a timely manner, and otherwise pay amounts due," and that they "have unreasonably and without justification refused to provide and/or delayed they payment of policy benefits." The SAC also sought declaratory relief that the allegations in each of the underlying actions triggered defendants' duties to defend and indemnify under the program.

To complete the lawsuits, in April 2014 the insurers filed a second action in Pennsylvania (PA2), seeking a declaration as to the two claims added by Victaulic. PA2 was later dismissed in light of the California action.

### *The Trial Court Grants Summary Adjudication for Victaulic on the Potential for Coverage*

Both sides moved for summary adjudication. The insurers sought summary adjudication on the basis that Pennsylvania law applied, that under *Kvaerner* "faulty workmanship" is not an "occurrence" and thus none of the nine claims would be covered. Victaulic sought summary adjudication that the insurers had a duty to defend and indemnify in connection with three of the claims.

Following argument, in December 2014, the court entered its order denying the insurers' motion and granting in part Victaulic's, holding that the insurers had a duty to defend the three claims because they all potentially involved "property damage" caused by an "occurrence." The order noted in part that "even if AIG were correct that Pennsylvania law applies, summary adjudication in Victaulic's favor is appropriate. In *Indalex Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa.* (Pa. Super. 2013) 83 A.3d 418, a Pennsylvania appellate court specifically rejected the arguments AIG makes here." The order further held that there were triable issues on the scope of indemnity as to what portions of the settlements are for covered losses and must be indemnified.

The court ordered the case bifurcated, with the declaratory relief claim to be tried first in a bench trial, which came to be called phase 1.

### *The Phase 1 Trial*

Phase 1 took place over 12 trial days in February and March 2015. On June 10 the trial court issued its statement of decision ruling for Victaulic on both fundamental issues—the insurers had a duty to defend and a duty to

6

indemnify in each of the underlying actions. As to the duty to defend, the court concluded that Taylor and Finberg, the primary claims handler on the claims, had "[e]ach testified during trial that AIG never denied that the [Victaulic] claims . . . gave rise to a potential for coverage and, accordingly, had always acknowledged the existence of a duty to defend Victaulic." But, the court noted, "In dramatic contrast to these averments, AIG initiated litigation against Victaulic in Pennsylvania asserting that thy had no duty to defend Victaulic in connection with the *Essex, Edge Lofts*, and *Elizabeth Lofts* cases on the grounds that, *inter alia*, garden-variety product liability claims do not constitute 'an occurrence' under AIG's policies with Victaulic." And so, in a sternly worded statement of decision, the trial court granted declaratory relief in Victaulic's favor on the duty to defend, holding that all the underlying claims triggered the potential for coverage. It also held that defendants had a duty to indemnify with respect to all of the claims except one, for which the duty to indemnify could not be finally determined until the claim resolved.

The trial court set the case for phase 2, a jury trial on the issues of breach of contract, bad faith, and punitive damages.

### *The Phase 2 Trial and Our Reversal*

As to the phase 2 trial, we described it in our earlier opinion this way: "Phase 2 . . . would last some three and one-half weeks, during which the jury would hear from numerous witnesses and over 110 exhibits would be introduced. The bulk of phase 2 was devoted to Victaulic's claim of bad faith, a 'cornerstone[]' of which was that the insurers acted unreasonably in litigating against Victaulic, and Victaulic sought to introduce evidence of the insurers' litigation positions in the Pennsylvania and California actions. The trial court initially ruled that such evidence would be excluded, but after

7

phase 1, Victaulic convinced the court to reconsider, and the court let the evidence in.

"And so it began, in the opening statement in phase 2, where counsel for Victaulic displayed the PA1 and PA2 declaratory relief complaints and told the jury that the insurers 'broke [their] promises' by suing, and that an insurer should not act as its insured's adversary as AIG did here when it filed the lawsuits. During its case-in-chief, Victaulic called AIG Claims personnel Taylor, David Luden, and Finberg as adverse witnesses, examining them in great detail about the litigation positions the insurers had asserted in the Pennsylvania complaints and in the California action.

"We need not detail all that examination here, but do note that one aspect of the court's ruling—and its fallout—is at the heart of two of the insurers' arguments on appeal, as discussed in detail below. Suffice to say here that it began with the trial court's allowance of Victaulic's counsel to interrogate Finberg with the insurers' responses to the RFAs [requests for admissions], which was improper enough. This error was compounded by the court's own involvement—twice—in the questioning of Finberg, the second round of which was abruptly halted for an in-chambers conference where the court concluded Finberg had 'made an admission that she perjured herself.' Finberg's testimony was abated at that point, and when she resumed the stand the next day, represented by personal counsel, the court ruled that she could claim the Fifth Amendment privilege against self-incrimination on a blanket basis, and would do so in front of the jury. Following that, Finberg was excused. But her testimony remained in the case. [¶] . . . [¶]

"It was against that background that Victaulic's closing argument focused on Finberg and her 'lies' in the RFAs—and all of it under penalty of perjury.

8

"The jury deliberated for some five hours, and on July 30 returned with a verdict answering a total of six separate questions in favor of Victaulic. The jury awarded damages for breach of contract on each of the seven claims in the exact amount sought, down to the penny. Likewise the *Brandt* [*v. Superior* Court (1985) 37 Cal.3d 813] bad faith attorney fee damages of $8,259,712.31, the exact amount its expert testified to. The jury also found, by clear and convincing evidence, fraud, oppression, or malice committed by a managing agent. The punitive damages trial followed, where, after brief deliberation, the jury awarded Victaulic $46 million.

"Following the verdict, on September 4, the trial court awarded Victaulic approximately $5.5 million in cost of proof sanctions under Code of Civil Procedure section 2033.420 for the insurers' refusal to admit there was a 'potential for coverage' for the claims and that the damage alleged was caused by an 'occurrence.' The trial court noted that the award duplicated the *Brandt* fee award. [¶] . . . [¶]

"The insurers moved for judgment notwithstanding the verdict and new trial on multiple grounds, including excessive damages. The trial court denied the motions, and the insurers appealed." (*Victaulic*, *supra*, 20 Cal.App.5th at pp. 959–961, fns. omitted.)

In an opinion filed in February 2018, we reversed. We held first that the trial court erred in allowing the responses to requests for admissions to be used for cross-examining a witness who had verified the responses. We also held that the trial court exceeded its authority and committed misconduct in its examination of Finberg, in making derogatory remarks, and allowing her to invoke the Fifth Amendment privilege against self-incrimination on a blanket basis, and in front of the jury.

9

Following remand, in February 2020, Victaulic filed a third amended complaint (TAC) essentially alleging that its bad faith claim was based on defendants' adoption of coverage positions contradicting their internal coverage determinations, manipulation of the "stacks" in Victaulic's program to avoid exhaustion, and strategic gamesmanship in making payment to Victaulic without acknowledging any duty to defend or indemnify.

### *The Motion to Disqualify*

On May 14, 2021, the insurers filed a motion to disqualify two attorneys who had recently joined the Pillsbury firm, Scott Greenspan and Arthur Aizley, and through them the Pillsbury firm itself. The motion was set for hearing before the Honorable Jeffrey Brand, to whom the case had been assigned for all purposes.

We digress briefly to note that this was the insurers' third attempt to disqualify the Pillsbury firm. The first attempt was in October 2015, shortly after the jury verdict in the phase 2 trial, when the insurers sought to disqualify Pillsbury from prosecuting criminal contempt charges that the trial court (the Honorable Frank Roesch) had instituted against the insurers. The charges were later dropped.

The second motion to disqualify was in 2018, following our remand, when the insurers moved to disqualify Pillsbury claiming there had been improper questioning of a defense witness at trial. The motion was denied, in the course of which the trial court (the Honorable Robert McGuiness) noted the "possibility that tactical abuse underlies the disqualification motion," going on to note the drastic nature of disqualification.

The insurers' motion here was accompanied by four declarations, those of Thomas Chaseman, an associate general counsel of AIG Claims; Michael Parker, deputy general counsel of AIG Claims; Reuben Cahn, a member of

the firm representing the insurers in this action; and Lawrence Klein, a lawyer who had, until 2017, been a partner at Sedgwick, LLC, the firm where Greenspan and Aizley had worked. Two of the declarations were lengthy: Chaseman's, 85 pages, Cahn's, 90 pages. But that was only the beginning of the voluminous paperwork.

Victaulic filed its opposition to the motion, accompanied by four declarations, from: Joseph Jean, a partner at Pillsbury, and the lead co-counsel in its representation of Victaulic; Mark Van De Voorde, the chief legal and administrative officer at Victaulic; Greenspan; and Aizley. David Keyko, the chief ethics counsel at Pillsbury, had also filed a declaration in support of Victaulic's position on an application for an order staying the case.

As it is Greenspan's work history at Sedgwick that is at the heart of defendants' motion, we discuss his declaration as some length, which begins with the fact he started at Sedgwick in 2003 as a special counsel, and became a "service partner" there. Greenspan worked under the direction of Klein, the senior partner at Sedgwick who was in charge of the firm's relationship with "AIG Claims." And concerning that work, Greenspan testified as follows:

"4. . . . My role simply was to handle the day-to-day tasks on insurance cases, with Mr. Klein calling the shots and making the decisions.

"5. Although most of the California and Nevada cases that I handled for AIG companies involved bad faith allegations, I do not recall ever being involved in a case for any AIG company where the insured's bad faith claim was a central issue in the dispute or litigation. Rather, the cases I oversaw all focused on various unique coverage issues and defenses.

"6. I likewise do not recall ever handling any case for an AIG company that involved coverage for defective products or other types of product liability claims. I never handled a case where Victaulic Company ('Victaulic')

11

was the insured seeking coverage from an AIG company. If Victaulic products were involved in any case on which I worked—and I do not recall that being the case—they were one of dozens, if not hundreds, of products included by plaintiffs on their voluminous defect lists. Issues regarding Victaulic products never arose in the coverage disputes that I was handling."

Greenspan did not consider himself "an expert on insurance coverage, coverage analysis, coverage opinion writing, coverage monitoring, or claims handling." As he put it, "my focus is and always has been on litigating cases. While I have experience supervising the preparation of coverage analyses and position letters as a result of two large cases on which I worked, any work I did relating to coverage positions on behalf of AIG companies was under Mr. Klein's direction and based on his strategic decision making."

Greenspan did not have any "substantial exposure to Megan Watt, . . . Finberg, or . . . Chaseman, [three] individuals . . . identified . . . by defendants . . . as being involved in claims decisions here." And he had "no 'playbook' information about any AIG company, much less the 'playbook' about handling a case such as this, to the extent defendants here have such a 'playbook.' . . . The cases on which [he] worked were managed based on their own unique facts."

Aizley, an associate at Sedgwick, played a minor role: he supported more senior lawyers and completed assignments given to him. He had minimal client contact and little, if any, interaction with AIG Claims executives and claims handlers. And, like Greenspan, he did not develop procedures, guidelines, or strategies and was unaware of any "playbook."

Greenspan and Aizley did not work on either of the insurers' declaratory judgment cases in Pennsylvania, did not work on this case, and did not work on any matters involving coverage under Victaulic's insurance

12

program.  Nor did they handle any matters involving policies covering product liability claims, much less any matters in which coverage was denied under the faulty workmanship doctrine.  Moreover, while there were bad faith claims in some matters they handled, they were, as Greenspan put it, "tangential to the coverage claims."  And none involved the bad faith claims involved in the TAC, that the insurers had taken litigation positions contrary to internal coverage assessments, manipulated claims to avoid exhausting primary policy "stacks," or strategically made payments while refusing to acknowledge coverage.

Greenspan spent some five pages in his declaration testifying in detail about the cases and projects he worked at Sedgwick, referring to the matters Chaseman had pointed to in support of defendants' motion, painstakingly describing the facts and issues in the matters, and how they were not similar to the facts or issues in this case.  For example, Greenspan testified that he (and to a lesser extent Aizley) worked on several matters in which developers sought coverage for construction defect suits.  Two specific matters were the MGM City Center and Pacific Coast Steel litigations, in both of which the underlying lawsuits focused on the incorrect placement of reinforcing steel in building superstructures and whether that error was caused by defective design drawings or negligent disregard of those drawings.  Greenspan was also involved in two matters concerning condominium developments in Southern California, the Treo@Kettner and Bosa matters.

Greenspan and Aizley devoted much of their time to two healthcare matters, the Sun Healthcare Group Litigation and the Small Smiles Holding Litigation.  In Sun, a chain of nursing homes sought coverage for "slip and fall" cases, claims relating to bed sores, and other personal injury claims under a novel theory of coverage, and the dispute centered on underwriting

intent, not bad faith. In Small Smiles, National Union sought to rescind coverage under a professional malpractice policy issued to a chain of dental clinics that had not disclosed it was being investigated for Medicaid fraud, and also denied coverage for claims arising out of intentional misconduct, specifically physical abuse of children.

Greenspan stopped working on AIG-related matters in 2013. He left Sedgwick the following year and subsequently focused on real estate litigation, although he did handle, without objection, one bad faith claim against an AIG company.

Greenspan decided to return to insurance coverage work, and in early 2018 he met with AIG Claims Deputy General Counsel Parker, told him he might join policyholder-side firms, and asked for an advance conflict waiver.[1] Parker agreed to provide a waiver for several firms, but not Pillsbury. As to it, Parker refused, telling Greenspan that Pillsbury was a "Red Zone" firm because of the way that it had litigated this case for Victaulic.[2]

Contrary to the suggestion in defendants' brief, Greenspan did not join Pillsbury immediately after his meeting with Parker. In fact, it was not until two years later, March 2020, when Pillsbury contacted Greenspan to see

---

[1] Greenspan testified he did so because AIG companies are notorious for seeking to disqualify lawyers that previously represented them. As Victaulic's attorney Jean put it at oral argument below, "we were able to find, by doing a search, ten different cases that AIG had disqualifications that they had filed over the course of the last 20 years. They lost eight of them, and they include stretches like saying that panel counsel was actually—even though they were panel counsel and representing the insured should be deemed to be counsel for one of the AIG companies, and therefore, should be disqualified. That is what Mr. Greenspan said he was concerned about."

[2] Parker did not deny making this statement. Rather, in his declaration he stated that "I do not recall ever using the phrase 'red zone' firm."

14

whether he would be interested in coming to the firm to work on insurance cases arising out of Covid-19. And in November 2020, after an extensive clearance process analyzing potential conflicts, Pillsbury determined Greenspan had no conflicts and offered him employment. Nevertheless, out of an abundance of caution, Pillsbury screened Greenspan from the Victaulic case, entering "an ethical wall" prohibiting him from working on the case, communicating about it with any person working on it, or accessing information about it in Pillsbury's electronic files. This wall was orally imposed on Greenspan's first day and reiterated in writing in January 2021.

Pillsbury hired Aizley in February 2021, following the same conflicts clearance process for him, which he cleared. Again as an extra precaution, Aizley was walled off from this case when he started, a wall confirmed in writing in April 2021. Neither Greenspan nor Aizley has worked on this case or shared information about their work at Sedgwick with the attorneys on it.[3] Van De Voorde, Victaulic's chief legal and administrative officer, testified that he had "never spoken" with Greenspan or Aizley, that he has "no idea" who they are, that they are "not part of the Jean and Kemp's team on this case."

Following Victaulic's opposition, the insurers filed four declarations in reply: a supplemental declaration of Chaseman, 126 pages in length; a supplemental declaration of Cahn, 25 pages in length; a supplemental declaration of Parker, six pages in length; and a supplemental declaration of Klein, seven pages in length. The insurers' reply also included a request for in camera review.

---

[3] As defendants note, during this appeal Aizley left Pillsbury.

15

Victaulic filed objections to the request for in camera review and to the supplemental declarations. Victaulic also filed a request for judicial notice, requesting notice of hundreds of pages of documents.

On June 15, the day of the hearing, the insurers filed two second supplemental declarations of: Cahn, 38 pages, and Klein, six pages. At the hearing, Judge Brand expressed his concern about the "materials . . . submitted this morning," and inquired how to make the best use of the time available that day. And the hearing ended with the understanding that the matter would be heard on June 18.

On June 17, the day before the continued hearing, the insurers filed a "notice of demonstratives" to be used at the June 18 hearing. They also filed three more supplemental declarations: the third supplemental declaration of Cahn, 164 pages in length; the second supplemental declaration of Chaseman, 48 pages in length; and the third supplemental declaration of Klein, 11 pages in length.

So, what Judge Brand had before him on the motion totaled over 2,000 pages. The hearing proceeded on June 18, and on July 19 Judge Brand issued his order denying the motion, an exhaustive 16 single-spaced page analysis where, carefully considering the evidence and the authorities, he concluded the insurers had failed to meet their burden of proof in several particulars.

Judge Brand's order began with several procedural rulings.[4] There followed the "background," a short description of "the case," followed by the

_____

[4] These rulings included:

Denying defendants' requests for: (1) an *in camera* review of reservation of rights letters sent to AIG member companies to other insureds; (2) an evidentiary hearing; and (3) an *in camera* review of Greenspan's billing entries.

16

"facts," which began with the observation that "the parties paint entirely different portraits of the work done by Greenspan and Aizley." And from there Judge Brand went on at length to discuss those facts, including Greenspan's experience at Sedgwick from 2004 to 2014, following which he summed up as follows: "In sum, Greenspan details his tenure at Sedgwick and working 'under the direction' of equity partner Lawrence Klein, a role he claims is mischaracterized by defendants, which incorrectly 'transforms [it] into the role' that 'Klein had,' and 'conflating my role . . . with that of Mr. Klein.' [Citation.]"

After summarizing the evidence, and describing the governing standards, Judge Brand found two threshold defects in the insurers' motion. The first was a significant question whether defendants, as distinct from non-party AIG Claims, were clients of Sedgwick. And he held that to the extent the record was unclear whether Greenspan and Aizley had represented defendants, defendants had failed to satisfy their initial burden of proving a prior attorney-client relationship.

Second, Judge Brand found that defendants had not satisfied their burden of proving that Greenspan or Aizley had the direct and personal relationship with defendants needed to create a presumption they possessed confidential information. Judge Brand found no evidence even remotely suggesting Aizley had such a direct relationship. And while noting that Klein, Greenspan's former superior, contended that Greenspan had such a

Granting in part and denying in part Victaulic's request for judicial notice.

Ruling on Victaulic's evidentiary objections to the Parker, Klein, and Cahn declarations.

Declining to consider demonstrative evidence "presented by the parties 1 or 2 days prior to the oral argument."

17

relationship, he credited Greenspan's contrary testimony, summing it up this way:

"It appears that Klein consistently conflates Greenspan's role with his, referring to Greenspan's 'discretion' and 'autonomy' and 'senior role.' [Citation.] Juxtaposed against these characterizations are Greenspan's repeated assertions that he worked 'under Klein' and at his 'direction,' supervising 'day-to-day litigation work,' and noting that Klein's salary was five times his. [Citation.] In fact, for most of Greenspan's tenure at Sedgwick he was not an equity partner, but rather Special Counsel for Non-Equity Partner. [Citation.] Greenspan testifies: [¶] Lawrence Klein was the relationship partner who dealt directly with AIG companies on the cases on which I worked at Sedgwick. It was a relationship he guarded closely and for which he was paid as much as $2.7 million a year by Sedgwick, approximately five times the largest amount I ever earned as a service partner at the firm. My role simply was to handle the day-to-day tasks on insurance cases, with Mr. Klein calling the shots and making the decisions. [Citation.] [¶] The same divide exists in the record with regard to the contact Greenspan had with the insurer companies or those that might be witnesses in this litigation. Greenspan disclaims any 'substantial exposure' to either. [Citation.] [¶] On this state of the record, the Court finds that Klein was the primary client contact. The Court also finds that defendants have failed to meet their burden to demonstrate that the relationship with Greenspan was direct within the meaning of *Khani* [*v. Ford Motor Co.* (2013) 215 Cal.App.4th 916]*, Farris*[, *supra*, 119 Cal.App.4th 671], and *Jessen*[ *v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698 (*Jessen*)]."

But beyond these threshold determinations, Judge Brand found that defendants had failed to satisfy the core requirement for the presumption

18

that they sought to invoke—the substantial relationship test. In particular, he found that "defendants have not met their burden to demonstrate that any of the information that either of Greenspan or Aizley obtained in their former representation of defendants is material to the evaluation, prosecution, settlement or accomplishment of Pillsbury's current representation of Victaulic in this case." "Defendants," he noted, "have not demonstrated that Greenspan and Aizley had any access generally to confidential information that would be of benefit in this litigation other than defendants['] general business practices and philosophy."

Supporting this conclusion, Judge Brand began by noting that defendants had failed to present any evidence that Greenspan or Aizley worked on Victaulic's claims against defendants or developed any litigation policies or procedures: "Most critically, defendants have not presented sufficient evidence that either Greenspan or Aizley (1) had any knowledge of defendants' actions regarding Victaulic while they were at Sedgwick; (2) worked on any of defendants' then current decisions about coverage questions regarding Victaulic; or (3) worked on the development of defendants' policies or procedure[s] to guide AIG's future conduct."

Judge Brand then determined that the matters on which Greenspan and Aizley had worked were "unrelated to the current litigation other than in the most general of terms," observing that legal questions such as the application of the "occurrence" trigger or exclusions for "your product" or "your work" were issues of general application in insurance litigation, too generic to establish a substantial relationship. He found defendants failed to show that Greenspan or Aizley possessed any "playbook" information specific enough to be material, going on to reject defendants' contention that any other construction litigation on which the two worked was substantially

19

related to this case, especially in light of Greenspan's "forceful" rebuttal. And, he noted, any litigation strategies that Greenspan and Aizley may have learned before leaving Sedgwick may no longer be current and, in any event, had been publicly disclosed by defendants. Lastly, Judge Brand determined that Pillsbury had established ethical walls for Greenspan and Aizley, so that no confidential information that they might have would be shared with other Pillsbury attorneys.

Following all that, Judge Brand set forth his "conclusion." After quoting at length from *Farris*, *supra*, 119 Cal.App.4th 671—where the Court described the evidence submitted by the moving party insurance company involving the extensive involvement of attorney Wilkins—he concluded as follows: "The evidentiary record here is vastly different. The nature of Greenspan and Aizley's representation is intensely disputed. Greenspan and Aizley did not share Wilkins['s] 'pervasive participation [and] . . . personal role in shaping, [defendants'] practices and procedures,' or the 'short time span' between Wilkins['s] 'departure' and his subsequent representation (six months versus eight years.) The Court finds that defendants have failed to sustain their burden with regard to issues critical to establishing a 'substantial relationship,' namely, whether defendant was a former client, whether there existed a 'direct relationship,' and the sufficiency of the relationship of the legal issues and the materiality of the information received during the earlier representation."

On August 13, defendants filed a notice of appeal. They also filed a petition for writ of mandate, which we summarily denied.

20

## DISCUSSION

### The General Principles of Attorney Disqualification

In *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1144–1146 (*SpeeDee Oil*), our Supreme Court set forth the "disqualification principles": "A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice. [Citation.] Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion. [Citations.] Nevertheless, determining whether a conflict of interest requires disqualification involves more than just the interests of the parties.

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.] Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. [Citations.]

"Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a

21

hallmark of our jurisprudence that furthers the public policy of ensuring ' "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." [Citation.]' To this end, a basic obligation of every attorney is '[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.' (Bus. & Prof. Code, § 6068, subd. (e).)"

**The Standard of Review**

*SpeeDee Oil* also set forth the standard of review: "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.]" (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1143.)

And as to what is required for the insurers to show an abuse of such discretion, it has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920) or one that is "arbitrary, capricious, patently absurd, or even whimsical." (*Artus v. Gramercy Towers Condominium Assn.* (2022) 76 Cal.App.5th 1043, 1051; see e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [" ' "arbitrary, capricious, or patently absurd" ' "] *People v. Benavides* (2005) 35 Cal.4th 69, 88 [ruling " ' "falls 'outside the bounds of reason' " ' "]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614 ["arbitrary, whimsical, or capricious"].) In its most recent observation on the subject, our Supreme Court said that "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person

could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

Moreover, in light of Judge Brand's conclusions that the insurers had not met their burden, the insurers have a have a heavy, perhaps insurmountable, burden on appeal, as set forth, for example in *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466: " 'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528.)" (Accord, *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967; *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067 [" ' "[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor"].)

The insurers have not even attempted to meet the requirements of *Sonic*. And they certainly have shown no abuse of discretion.

**The Insurers Have Shown no Abuse of Discretion: Judge Brand's Ruling Was Right**

*Introduction*

Defendants' motion is based on California Rules of Professional Conduct 1.9(a): "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the

23

interests of the former client unless the former client gives informed written consent." (See generally *Ogara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1124 [prohibition of successive representation "grounded in both [Rules] and governing case law"].)

Disqualification under this principle is governed by the "substantial relationship" test, that it, an attorney will be disqualified only when there is "a 'substantial relationship' between the subjects of the prior and current representations." (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 (*Cobra Solutions*).)

The substantial relationship test was discussed at length in *Jessen*, *supra*, 111 Cal.App.4th 698, one of two cases primarily relied on by the insurers here. There, attorney Wilkins represented plaintiff Jessen in an action against Hartford. Hartford moved to disqualify Wilkins and his firm on the ground he represented Hartford in numerous matters when Wilkins was an associate with another firm that represented Hartford. In opposition, Wilkins provided the court with two orders from federal district courts in actions against defendant by other plaintiffs represented by Wilkins, where defendant had made unsuccessful attempts in those actions to disqualify Wilkins. Relying on the orders, the trial court denied Hartford's motion on the basis it was collaterally estopped from relitigating the disqualification issue.

The Court of Appeal reversed, holding that the trial court should have applied the substantial relationship test. After a lengthy review of the evolution of the test, the court offered these guidelines for ruling on disqualification motions in successive representation cases: "[T]he trial court must first identify where the attorney's former representation placed the attorney with respect to the prior client. If the court determines that the

24

placement was direct and personal, . . . [this aspect is] settled as a matter of law in favor of disqualification and the only remaining question is whether there is a connection between the two successive representations, a study that may not include an 'inquiry into the actual state of the lawyers knowledge' acquired during the lawyer's representation of the former client. . . . However, if the court determines the former attorney was not placed in a direct, personal relationship with the former client, the court must assess whether the attorney was positioned during the first representation so as to make it likely the attorney acquired confidential information relevant to the current representation, given the similarities or lack of similarities between the two." (*Jessen*, *supra*, 111 Cal.App.4th at pp. 710–711.) "Direct and personal" placement is where an attorney was "personally involved in providing legal advice and services to the former client," thus giving rise to a conclusive presumption that confidential information passed to counsel. (*Id.* at p. 709.)

Recognizing that the standard of review is abuse of discretion, defendants assert that discretion is "limited by the applicable legal principles," and that here Judge Brand "committed a series of legal errors— including [his] refusal to apply the substantial relationship test's *per se* rule"—and thus made a ruling that resulted in "numerous errors of law." The insurers make two arguments, the first of which is that "Attorneys Greenspan and Aizley must be disqualified due to their prior representation of AIG in substantially related matters." The argument has four bold-faced subparts: "1. This insurance coverage case is inherently similar to the attorneys' prior representation"; [¶] "2. *Jessen* and *Farris* require disqualification"; [¶] "3. The trial court's analysis contradicted binding case law concerning the proper application of the substantial relationship test";

25

and [¶] "4. Victaulic alleges a broad, years-long corporate policy to deny benefits to numerous policy holders, directly implicating Greenspan's and Aizley's prior representation of defendants."

The first bold-faced argument—"inherently similar"—is less than a page long and, citing no record references, states in conclusory fashion, in bullet-point fashion yet, four areas where the representation was supposedly similar.[5] It then asserts that it involved the "same claims handlers, managers, and executives" (listing five), and involved "coverage positions on the same questions of interpretation and application of AIG's occurrence-based [general liability] policies." And, the insurers go on, there is "remarkable similarity between the prior and subsequent representations," that the matters on which Greenspan and Aizley worked at Sedgwick were "nearly identical to this action"—indeed, that this case involves the "exact issues" Greenspan and Aizley handled.

That is some hyperbole: the matters on which Greenspan and Aizley worked at Sedgwick were not "nearly identical" to this case. And whatever the superficial resemblances, they do not suggest, let alone demonstrate, that Greenspan or Aizley possesses confidential information material to this case. In short, defendants have shown no legal error: Judge Brand was right for several reasons, the first of which is his decision that defendants failed to meet their burden of showing a prior attorney-client relationship.

### No Prior Attorney-Client Relationship

---

[5] • Coverage decision-making for construction defect claims.
• In West Coast condominium projects.
• Alleging damage caused by faulty plumbing components.
• Handled by AIG Claims Construction Defect Claims Group.

It hardly needs citation of authority that the rule against representation adverse to a former client does not apply if there was no attorney-client relationship between the attorney and the complaining party. (*Meehan v. Hopps* (1956) 144 Cal.App.2d 284, 293.) And thus defendants had "the burden to show . . . the fact of the former representation." (*In re Charlisse C.* (2008) 45 Cal.4th 145, 166, fn. 11.)

Defendants submitted no declarations from any officer or employee of any of the three insurers, but only declarations from AIG Claims employees Chaseman and Parker and its "relationship partner" at Sedgwick, Klein. These declarations hardly satisfied the insurers' burden, as the declarations talked in legal generalities, loosely using "AIG" and "AIG" appellations, saying, for example, things such as Greenspan and Aizley worked on matters for "AIG member companies." The insurers' briefing here is no less vague, saying things like Greenspan and Aizley "represented AIG in numerous matters"; that they "billed AIG"; that "they handled numerous coverage matters for AIG"; and that they advised "AIG—including AIG Claims and its Construction Defect Claims Group—regarding disputes between AIG and its insureds (like Victaulic) over whether those . . . claims were covered by insurance." And defendants sum up, "most of Greenspan's and Aizley's practice . . . involved representing (and billing) AIG."

The situation was made even more complicated by documents the insurers submitted below that showed it "was customary for Sedgwick LLP to be retained by AIG Claims, Inc," an entity never discussed by the insurers. It was, and is, anything but clear. It was, and is, "confusing," the very word defendants' attorney Cahn used when attempting to explain it to Judge Brand at the June 15 hearing. Here is that explanation:

27

"Going [on] to the entities, let me try and step back a little bit and explain AIG and how it works because I concede that it's quite confusing. AIG as such is just a holding company, and the defendants themselves are insurers . . . . In fact, the choice of which insurer will insure a given risk is based solely on considerations of which insurers are admitted in certain markets to offer certain rates in certain markets. The insurers themselves employ no claims handlers. No one who addresses or considers coverage in any way, shape, or form. At certain times, the insurers have employed underwriters, but at other times, they have had quite literally no employees at all. At this time, my understanding is that none of what we'll refer to as the paper insurers have any employees at all. [¶] So when AIG as an overall entity receives a claim from one of its insureds, the entity that receives the claim as the agent of AIG is AIG Claims which was previously named Chartis . . . . It's always employed the relevant individuals who handled these claims who determined coverage who as agents of the insurers hired counsel to represent the insurers, and who interacted with those counsels as agents of the paper insurers . . . . AIG is always in connection with all claims handling, coverage, coverage litigation, or defensive litigation of insureds the agent of the paper holding companies, and that was true both in this case, and it was true in all the litigation that was handled—the litigation and the coverage representations that were handled by Mr. Greenspan and Mr. Aizley and Sedgwick generally speaking. Sedgwick had a master agreement with AIG Claims to represent AIG insurers and would interact with AIG Claims as the agent of the individual insurers."

AIG member companies. AIG insurers. AIG Claims. AIG Claims, Inc. And defendants mere "paper insurers," whatever that means.[6]

Defendants point to a summary prepared by Chaseman, an associate general counsel at AIG Claims, showing that Greenspan and Aizley billed thousands of hours to various AIG Claims "handling offices." But defendants cite to nothing showing they retained Sedgwick to represent them, and instead point to statements by Greenspan and Aizley in their declarations about the Sun Healthcare and Small Smiles litigations. Notwithstanding the assertion in insurers' brief, neither Greenspan nor Aizley admitted that he represented defendants rather than AIG Claims in those cases.[7]

Defendants assert that AIG Claims acts as the "legal agent" for defendants, and therefore under Rule 1.13 of the Rules of Professional Conduct, Greenspan and Aizley represented them by representing AIG Claims. Rule 1.13 has nothing to do with whether a lawyer who represents one company also represents its affiliates. Rather, the rule reminds lawyers retained by an organization that they represent the organization and not its directors, officers, employees, "or other constituents" such as an agent. (See Rules Prof. Conduct, rule 1.13(a).) In any event, defendants point to no evidence demonstrating that AIG Claims was acting as their agent in the matters on which Greenspan and Aizley worked at Sedgwick, and thus fail to

---

[6] As Victaulic notes, defendants fail to explain how a "paper company" could possess confidential information that can form the basis for a disqualification motion.

[7] The only evidence of actual representation cited by defendants is a statement by Greenspan made in explaining he had been asked by AIG Claims to monitor a trial involving National Union in part of the Small Smiles Holdings litigation, which has nothing to do with this case. And there was evidence Greenspan was an attorney of record for one of the insurers in a published opinion.

identify any confidential information that might be attributed to them under an agency theory.

Finally, citing *Morrison Knudson Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, defendants assert that "when separate corporate subsidiaries share operations and share a legal department, the various subsidiaries must be treated as the same entity for conflict purposes." The case says no such thing. Rather, it upheld findings that a parent and its wholly owned subsidiary were " 'closely' enough related to be treated as one entity" for conflict purposes (*id*. at p. 247), going on to note that its holding was based on "[a] number of considerations," including whether two entities' operations and management personnel were integrated. (*Id*. at pp. 245–246.) No such integration was shown here.[8]

In sum, Judge Brand did not abuse his discretion in finding the insurers failed to satisfy their burden to prove a prior attorney-client relationship. Likewise their burden showing that Greenspan or Aizley had a direct personal relationship with them, the second basis for Judge Brand's ruling.

### *No Personal Relationship*

Defendants do not seek disqualification on the ground that either Greenspan or Aizley actually possesses confidential information material to this case. Instead, they seek disqualification based on a presumption that Greenspan and Aizley learned confidential information in representing AIG

---

[8] Lest there be any doubt on the subject of integration, defendants filed a motion in limine to preclude any reference to AIG based on their separate corporate existence. (See also *Lease Crutcher Lewis WA, LLC v. National Union Fire Ins. Co. of Pittsburgh, PA* (W.D. Wash. Oct. 20, 2009, No. C08–1862RSL) 2009 WL 3444762, at *3–*4 [successfully moving to dismiss contract and other claims against AIG Claims based on its corporate existence separate from National Union].)

Claims. This presumption requires several conditions, including that counsel had a "direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation." (*Cobra Solutions*, *supra*, 38 Cal.4th at p. 847.)

To begin with, there was no evidence that Greenspan or Aizley ever had any direct communication with any officer or employee of any of the three defendant insurers. Beyond that, Greenspan testified he worked under the close direction of Klein, who controlled—and "closely guarded"—the relationship with AIG Claims, that he, Greenspan, merely "supervised day-to-day litigation work." Greenspan testified he was not involved in formulating overarching strategy; had little exposure to AIG Claims's assistant general counsel, senior executives, or claims handlers, including Finberg; and provided little advice when he did. While Klein contradicted Greenspan to some extent, Judge Brand credited Greenspan, a factual determination that must be accepted here. (*Ahmanson*, *supra*, 229 Cal.App.3d at p. 1451 ["the trial court's resolution of factual issues arising from competing declarations is conclusive on the reviewing court"].)

As to Aizley, Judge Brand found no direct relationship even with AIG Claims based on "uncontradicted" evidence that Aizley was an associate at Sedgwick assisting Greenspan and engaged primarily in discovery and mediation-related matters. Indeed, as Aizley's declaration states, his role was merely "to complete specific assignments I was given and to support senior counsel and partners." Aizley also testified that he "almost never personally interacted with personnel from AIG companies," and that he was not involved in giving any strategic advice to the AIG companies' senior management.

31

### *No Substantial Relationship*

It is true, as the insurers argue, that disqualification of counsel is based among other things on "the need to maintain ethical standards of professional responsibility" and the "paramount concern" of preserving public trust in the administration of justice. (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1145.) Thus, in the successive representation context, courts focus on the ethical duty imposed by the Rules of Professional Conduct to continue protecting a former client's confidential information. (See *Cobra Solutions, supra,* 38 Cal.4th at p. 847; see also *Fremont Indemnity Co. v. Fremont General Corp.* (2006) 143 Cal.App.4th 50, 66 ["An attorney's representation of a client in a matter against a former client implicates the duty of confidentiality"].) While defendants point to Rule 1.9 of the Rules of Professional Conduct, they ignore the core requirement of that rule—that in the former representation counsel likely had access to confidential information that is material to a current matter.

The Rules of Professional Conduct do not bar an attorney from taking a matter adverse to a former client whenever there is any connection, no matter how tenuous, with matters previously handled for the client. Instead, Rule 1.9 prohibits an attorney from taking a case adverse to a former client, without that client's consent, only if it involves "the same or a substantially related matter" as a prior representation of the client. (Rules Prof. Conduct, rule 1.9(a).) Moreover, current and former matters are deemed substantially related only "if they involve a substantial risk of violation" of a duty owed the former client.

Contrary to defendants' assertion, this materiality requirement is not satisfied by mere relevance. The presumption that former counsel possesses confidential information is triggered only if there is a substantial risk that

32

confidential information would be used in the current representation, which occurs where it is "reasonable to conclude" that the information "would *materially* advance the [present] client's position." (*Farris, supra,* 119 Cal.App.4th at p. 681, quoting Rest. (3d) Law Governing Lawyers, § 132, com. (iii).) As one recent case put it, reversing an attorney disqualification, to support disqualification " ' "the information acquired during the first representation [must] be 'material' to the second; that is, . . . directly at issue in, or have some critical importance to, the second representation." ' " (*Wu v. O'gara Coach Co., LLC* (2019) 38 Cal.App.5th 1069, 1083 (*Wu*).)

Defendants assert that there is a "remarkable similarity between the prior and subsequent representations," that the matters on which Greenspan and Aizley worked at Sedgwick were "nearly identical to this action," and that this case involves the "exact issues" Greenspan and Aizley handled. Hardly. As Judge Brand found, neither Greenspan nor Aizley worked on any case against Victaulic or any matters concerning coverage under Victaulic's insurance program, a finding amply supported by their declarations.

In contending that Greenspan likely obtained confidential information concerning their litigation strategy, defendants submitted a declaration from AIG Claims associate general counsel Chaseman testifying that Greenspan had access to "internal guidelines, training methodology, underwriting protocols, litigation policies, and other confidential institutional information." Such generalized assertions cannot establish a substantial relationship: "Under California law, a law firm is not subject to disqualification because one of its attorneys possesses information concerning an adversary's general business practices or litigation philosophy . . . ." (*Wu, supra,* 38 Cal.App.5th at p. 1083; see also *Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 918 ["Merely knowing of a former client's general

business practices or litigation philosophy is an insufficient basis for disqualification based upon prior representation"].) In any event, both Greenspan and Aizley denied that they developed any claims handling strategies or learned any "playbook" information about handling claims.

Defendants also failed to show that any litigation strategies or philosophies to which Greenspan or Aizley might have had access are confidential. As Judge Brand found, defendants' lawyers, including in-house counsel supervising this case, have publicly shared their litigation strategies, including those specifically relating to bad faith claims. And if defendants are now employing new strategies, Greenspan and Aizley, who left Sedgwick some eight years ago, have no way of knowing them.

Superimposed on all the above is the prejudice that Victaulic would suffer by disqualification here. As *SpeeDee Oil* noted—and as Judge McGuiness expressly recognized in denying the insurers' second attempt to disqualify Pillsbury—disqualification motions are subject to tactical abuse and can have drastic consequences. That is particularly true here, given Victaulic's general counsel's testimony that if Pillsbury is disqualified, Victaulic will suffer irreparable harm, as this case is "by far the single biggest, most costly and most important case Victaulic has had since I joined as it concerns hundreds of millions of dollars of insurance that is at risk"— not to mention lose the law firm that has represented it for nine years.

The insurers second bold-faced sub-argument is that "*Jessen* and *Farris* require disqualification," going on to assert that "the case for disqualification here is even stronger." This is quite an overstatement.

To begin with, defendants mischaracterize *Jessen*. As described above, the trial court did not, as the insurers put it, deny disqualification because the work performed by attorney Wilkins, was limited "by the facts and

circumstances relevant to a particular claim." In fact, the trial court had denied disqualification based on collateral estoppel because two federal courts had denied previous motions by Hartford to disqualify Wilkins. (*Jessen, supra*, 111 Cal.App.4th at pp. 702–703.) And while the Court of Appeal reversed, it did not instruct the trial court to disqualify Wilkins, but rather to determine whether information material to Wilkins's former representation of Hartford, "given its specific legal and factual issues," was material to his current representation against Hartford, "given its factual and legal issues." (*Id*. at p. 713.) Moreover, far from suggesting that this test inevitably compelled disqualification, the Court of Appeal acknowledged that the test was "anything but a 'bright line' standard." (*Ibid*.)

Defendants similarly mischaracterize *Farris*. While *Farris* remanded with instructions to disqualify the attorney in question, again Wilkins, it did so based on the extraordinary nature of Wilkins's prior representation. The suit involved in *Farris* was filed in December 1997, only months after Wilkins left a firm where he had represented Fireman's Fund in 266 matters over the course of 10 years. (*Farris, supra*, 119 Cal.App.4th at p. 677.) More importantly, Wilkins had discussed settlement, litigation, and claims handling strategies with top-level Fireman's Fund employees—indeed, teaching seminars to Fireman's Fund personnel on bad faith litigation. (*Id*. at p. 677 & fn. 4.) As Judge Brand aptly put it, the disqualification of Wilkins in *Farris* "rest[ed] primarily upon the evidence of Wilkins's pervasive participation, and indeed his personal role in shaping, [Fireman's Fund's] practices and procedures in handling California coverage claims, practices, and procedures . . . ." (*Id*. at p. 688.)

Ignoring these facts, the insurers quote isolated snippets from *Farris*, trying to create the impression that the decision held coverage disputes

35

inherently related to bad faith actions under the substantial relationship test. But the paragraph following defendants' block quote from *Farris* stressed that Wilkins was "instrumental in formulating those strategies and philosophies" that would be critical to the outcome of the lawsuit (*Farris, supra*, 119 Cal.App.4th at p. 685); and the very next paragraph observed that Wilkins probably would be cross-examining the claims personnel with whom he had worked. (*Ibid*.) In sum, *Farris* found a substantial relationship based on the extraordinary direct and personal involvement of Wilkins in shaping his former client's policies and strategies. (*Id*. at p. 680.) The situation here is a far cry.

Finally, we turn to the insurers' last bold-faced sub-argument in support of argument I, that "Victaulic alleges a broad years-long corporate policy to deny benefits to numerous policyholders. . . ." Victaulic describes this argument as a "new one," asserting that defendants cite to "documents *not* submitted to the Superior Court," and thus an argument that is "both improper and baseless." Elaborating, Victaulic asserts as follows: "Although defendants repeatedly accuse Victaulic of asserting a company-wide scheme, and devote the largest section of their substantial relationship discussion to arguments concerning this scheme, they did not make these arguments or, indeed, even mention a company-wide scheme in their motion to disqualify. Nor did they make those arguments in their reply, [citation], though there is a vague reference there to a 'grand' scheme. [Citation.] [¶] Even more important, defendants did not cite to the Superior Court most of the evidence upon which they now rely. The closing argument that defendants now extensively quote was not referenced in either their motion or reply. Indeed, far from drawing this quote from any document submitted to the Superior Court, defendants cite to the record in the previous appeal to this court. The

36

Victaulic motion that defendants also quote was not submitted with the motion to disqualify or reply either; instead, defendants cite to a Victaulic filing before the motion. And while the discovery requests defendants cite were attached to a (third) supplemental declaration submitted the day before the final hearing on the motion to disqualify, there was no mention of a company-wide scheme in the declaration discussing the requests."

The insurers' reply brief takes issue with this, and argues for several pages that there was no waiver, going on to label Victaulic's argument as "border[ing] on the amusing, since all the allegations of a company-wide scheme come from *Victaulic's own* filings below." The insurers quote from their reply brief below, and cite to statements in Chaseman's and Klein's declarations, and their "no waiver" argument ends with this: "Yet the key 'evidence' relied on here is not only not new—it is Victaulic's *own words*, drawn from Victaulic's *own filings and arguments* below. The key materials include: (1) Victaulic's motion following remand for leave to file a third amended complaint; and (2) Victaulic's closing argument at the 2015 trial. In arguing for leave to file its third amended complaint, Victaulic stated: 'AIG's conduct is an extension of AIG's "no coverage" *scheme* Victaulic first exposed in 2015 involving AIG's improper attempt to limit, at any cost, its exposure to product liability and product defect claims under excess policies is issued to Victaulic *and other policy holders* . . . AIG's exposure is ongoing and potentially involves *thousands (or more) of other policy holders*.' " "AIG orchestrated the entire thing so that they wouldn't have to pay. *Not just these claims. Any claim. Any product liability claim at all.*"

The insurers' argument is less than candid.

As to the insurers' assertion that in its motion to amend Victaulic "consistently and repeatedly" asserted "a 'company-wide' scheme," the motion

referred to AIG's "company-wide *view of its product liability underwriting*," which had changed after the 2008–2009 global financial crisis, threatening AIG's liquidity and causing "company-wide *anxiety*." The motion also noted that defendants' "*exposure* is ongoing and potentially involves thousands (or more) of other policyholders." A company-wide risk in entirely different from a "company-wide conspiracy to deny claims."

As to the focus on counsel's closing argument, the insurers rely essentially on six words in the argument—six words in a three- and one-half-week trial. And having dealt with the appeal from that trial, it is not a fair reading of the closing argument. As we described it in our opinion, Victaulic's closing arguments focused "on 'Finberg,' 'RFAs,' 'lies,' and 'penalty of perjury,' words used so often, and so interrelatedly, that it is truly difficult to count." (*Victaulic*, *supra*, 20 Cal.App.5th at p. 952.)

In any event, assuming the issue were not forfeited, it has no merit, as there is no showing that Greenspan or Aizley had any confidential information.

### *Pillsbury*

The insurers' second argument is that Greenspan's and Aizley's conflict "must be imputed to their firm, and the firm must also be disqualified." As to this, it is enough to note the discussion above, that Greenspan and Aizley themselves were not disqualified. Beyond that, the argument would fail because Pillsbury created an ethical wall that "impos[es] preventative measures to guarantee that information will not be conveyed" to the Pillsbury lawyers working on this case.

Defendants no longer dispute that the ethical wall protects against disclosure of any confidential information that Greenspan supposedly possesses. Instead, they assert that these protections were not timely

imposed because Pillsbury did not "formally screen" Greenspan until months after he was hired, or Aizley until AIG Claims complained about their presence. Judge Brand rejected the claim, finding that "at the time of their hires—Greenspan in November 2020 and Aizley in February 2021—Pillsbury orally established an ethical wall for each." The wall was discussed with Greenspan and Aizley before each was hired, and it barred them from working on this case, discussing any information that they might have regarding defendants or AIG Claims, or accessing information in Pillsbury's electronic files concerning the case. Defendants do not even attempt to explain why these screening procedures are insufficient, much less how Judge Brand abused his discretion in finding them sufficient.

## DISPOSITION

The order denying the motion to disqualify is affirmed. Victaulic shall recover its costs on appeal.

                                        _____
                                        Richman, Acting P.J.


We concur:


_____
Stewart, J.


_____
Miller, J.


*Victaulic Company v. American Home Assurance Company et al.*
(A163396)


40

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Jeffrey S. Brand |
| Attorney for Plaintiff, Cross-Defendant, and Respondent, Victaulic Company: | Pillsbury Winthrop Shaw Pittman LLP, Daniel H. Bromberg, Colin T. Kemp; |
| Attorney for Defendants, Cross-Complainants and Appellants, American Home Assurance Company et al.: | Riordan & Hogan, Dennis P. Riordan, Ted Sampsell-Jones; Keller/Anderle LLP, Jennifer L. Keller, Reuben Camper Cahn. |