Filed 4/2/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| JEFFREY WINTER, as Trustee, etc., | B328474 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22STPB12633) |
| v. | |
| FRANKLIN H. MENLO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Ana Maria Luna, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Adam F. Streisand, Golnaz Yazdchi, Valerie E. Alter, Alexandra M. Banis, and Taylor L. Mangan for Defendant and Appellant.

Willkie Farr & Gallagher, Alex M. Weingarten, and Logan M. Elliott for Plaintiff and Respondent.

_____

Appellant Frank Menlo[1] appeals from the probate court's order disqualifying his attorney Adam Streisand and Streisand's law firm, Sheppard, Mullin, Richter & Hamilton LLP (Sheppard Mullin). Respondent Jeffrey Winter moved to disqualify Streisand and Sheppard Mullin based on his e-mail exchanges with Streisand where he consulted with and sought to retain Streisand to represent him in his case against Frank. The probate court disqualified Streisand and Sheppard Mullin under rule 1.18 of the California Rules of Professional Conduct (Rule 1.18). This rule prohibits attorneys from representing a client with interests materially adverse to those of a prospective client where the attorney received confidential information that is material to the matter.

Frank argues Rule 1.18 requires courts to evaluate whether information shared by a prospective client is material at the time of the disqualification, not whether it might have been material at some point in the past. He asserts the probate court erred when it found the information disclosed by Jeffrey was confidential and material, but failed to consider whether the information was material at the time of disqualification.

While we agree with Frank's assertion that materiality should be evaluated at the time of disqualification under Rule 1.18, we conclude the information disclosed to Streisand remained confidential and material here. Accordingly, we affirm.

---

[1] Because numerous individuals related to this action share surnames, we refer to them by their first names, intending no disrespect.

## FACTUAL AND PROCEDRUAL BACKGROUND

### I.  The trusts

Sam and Vera Menlo established numerous trusts for each of their children, grandchildren, and future generations with the intent to grant their significant assets to their descendants. These trusts included the Menlo Trust created on February 22, 1983 (the 1983 Trust), and the 2004 Menlo Trust dated July 12, 2004 (the 2004 Trust).  The 1983 Trust was amended in 2009, appointing Jeffrey, Frank, and Rafael Deutsch ("Ramy") as co-successor trustees if either Sam or Vera ceased to act as trustee. Jeffrey, Frank, and Ramy are also cotrustees of the 2004 Trust.

### II.  Jeffrey seeks legal counsel in a potential dispute with Frank

In March 2021, Jeffrey sought legal counsel to represent him in a potential litigation against Frank.

Because of the confidential nature of these communications, we only summarize the general substance of the March 2021 e-mail exchange.

In March 2021, Jeffrey contacted Streisand via e-mail. Jeffrey first inquired whether Streisand would be conflicted out from representing Jeffrey in litigation involving Frank. Streisand assured Jeffrey that there was no conflict.  However, Streisand was unaware that Jeffrey intended to sue Frank. Jeffrey then shared information about the litigation.  This included his theory of the case, case-related documents, potentially interested parties, and his understanding of Vera's health condition.  Streisand then shared his understanding of the case, including Jeffrey's potential theories and Jeffrey's belief that Frank exercised undue influence over Vera.  Jeffrey then confirmed Streisand's understanding of the case.  At this point,

3

Streisand came to understand that Jeffrey intended to sue Frank. Streisand then conducted an additional conflicts check, which revealed that Streisand previously represented Frank. Streisand informed Jeffrey that, because Frank was a former client, he could not now sue Frank.

## III. The parties' petitions

On December 19, 2022, Jeffrey filed a petition against Frank. The petition sought instructions regarding the trust, Frank's suspension and removal as cotrustee, an accounting, and an order revoking a power of appointment executed by Vera on January 11, 2019, for lack of capacity. The petition also alleged causes of action for financial elder abuse, breach of fiduciary duty, breach of trust, and wrongful taking of property.

Frank retained Streisand and Sheppard Mullin and responded with his own petition for instructions, asking the probate court to declare invalid the revocation of his 2019 power of appointment.

## IV. Jeffrey's motion to disqualify Frank's counsel

On March 14, 2023, Jeffrey moved to disqualify Streisand and Sheppard Mullin under Rule 1.18 on the grounds that Jeffrey was a prospective client who shared confidential material information with Streisand during the March 2021 e-mail exchange. Frank opposed.

The probate court granted the motion, finding Jeffrey was Streisand's prospective client and Streisand could not now represent Frank, who had materially adverse interests to Jeffrey under Rule 1.18. In so ruling, the probate court found Jeffrey, either through Jeffrey's son Jeremy or directly, shared confidential and material information with Streisand and that disqualification was necessary to avoid the use, intentionally or

4

inadvertently, of that information.  The probate court noted that in the March 18, 2021 e-mail exchange, Jeffrey shared information that he knew " 'for a fact.' "  It also noted that if Streisand continued to represent Frank, there could be an issue in discovery in terms of what Jeffrey and Jeremy knew at the time.  "Now, Mr. Streisand's sitting on information that he knew—at least, someone in the Winter family knew as of March 18, 2021, the particular fact and that's not what they're testifying to or doesn't raise it against the Winters family and that means he's not vigorously able to advocate for . . .Frank . . . ."  The probate court found that Jeffrey and Jeremy communicated information to Streisand "which would be the basis for [Jeffrey's] litigation strategy against [Frank]."

The probate court also found Rule 1.18's exceptions to disqualification did not apply because Streisand had not taken reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether to represent Jeffrey.  The probate court noted the subject of the initial e-mail exchange was whether Streisand had a conflict of interest, which "would certainly cause an attorney who is in the consultation phase of interacting with a client to hit the pause button until the conflict check was completed."  "Had . . . Streisand simply completed the conflict check by limiting the scope of his questions to [Jeffrey] to ascertain who would be parties to the litigation (especially the target individual(s)) then there would be no issue with disqualification because . . . Streisand would have declined to represent [Jeffrey] sooner than March 26, 2021 and without disclosure of thoughts as to [Jeffrey's] litigation theories."

In evaluating the equities, the probate court considered and balanced:  Frank's right to an attorney of his choosing,

5

Streisand's and Sheppard Mullin's interest in continuing with Frank's representation, the potential financial burden on Frank in hiring new counsel, and the potential tactical abuse as to the manner by which Jeffrey consulted with Streisand.  It noted the case was still in its infancy given only the petition and some objections had been filed and the parties had yet to enter discovery.  Further, it found it would not be that difficult for Frank to find other competent trust litigation counsel to represent him at this early stage of the litigation.

Frank appealed.

## DISCUSSION

Frank argues the probate court failed to consider whether the material disclosed by Jeffrey to Streisand remained material under Rule 1.18 despite the filing of Jeffrey's petition and the disclosure of some information in the petition's allegations.  We conclude the probate court correctly evaluated the information's materiality at the time of disqualification and correctly disqualified Frank's counsel.  We also conclude the equities weighed in favor of that ruling.[2]

## I.    **Standard of review**

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.  [Citations.]  If the

_____

[2]    Frank requested judicial notice of a January 9, 2017 trial court order signed by the Honorable Maria E. Stratton, disqualifying Sheppard Mullin from representing Frank in a prior action.  Frank sought to bring to our attention a potential conflict that would require Justice Stratton's recusal from the present action.  We now grant the request for judicial notice.  (Evid. Code §§ 452, 453.)  We note, however, Justice Stratton recused herself from this appeal prior to Frank filing his request and took no part in this decision.

6

trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 (*SpeeDee Oil*).) However, "where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law." (*Ibid.*)

Here, the parties dispute the applicable standard of review. On the one hand, Jeffrey asserts we should review the probate court's decision under the deferential abuse of discretion standard because there are disputed material facts. On the other hand, Frank argues de novo review applies because his argument is primarily one of statutory interpretation and the underlying facts are undisputed. We agree with Frank.

Frank's argument is based on the interpretation of materiality under Rule 1.18, which presents a question of law. (See *Austin v. Medicis* (2018) 21 Cal.App.5th 577, 590.) Further, the facts underlying the motion to disqualify are all contained in the e-mail exchanges between Streisand, Jeffrey, and Jeremy. While the parties may disagree as to the characterization of those facts, this does not mean the facts are in dispute. (See *Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 980; *Am. Contractors Indem. Co. v. Saladino* (2004) 115 Cal.App.4th 1262, 1267.) Here, Jeffrey's motion and the probate court's ruling relied on undisputed facts, specifically, the e-mail exchange between Streisand, Jeffrey, and Jeremy.

7

The probate court made no factual or credibility findings that would bind us as the reviewing court.  Therefore, our review is de novo.

## II.    Rule 1.18

"The authority of a trial court 'to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers." ' " (*Syre v. Douglas* (2024) 104 Cal.App.5th 280, 293 (*Syre*), quoting *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.)

"It has long been the rule that a 'former client may seek to disqualify a former attorney from representing an adverse party by showing the former attorney actually possesses confidential information adverse to the former client.'  [Citation.]  Actual possession of confidential information need not be proved in order to disqualify the former attorney; it is enough to show a 'substantial relationship' between the former and current representation."  (*Syre*, *supra*, 104 Cal.App.5th at p. 293.)

In November 2018, the California Supreme Court adopted American Bar Association Model Rules of Professional Conduct rule 1.18, which defined the scope of an attorney's duties to a prospective client.  (*Syre*, *supra*, 104 Cal.App.5th at p. 294.)  A prospective client is defined as "[a] person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from the lawyer in the lawyer's professional capacity." (Rule 1.18(a).)  Here, the parties agree Jeffrey was Streisand's prospective client.

Rule 1.18(b) prohibits a lawyer from using or revealing the prospective client's confidential material information.  Paragraph (b) provides:  "Even when no lawyer-client relationship ensues, a

8

lawyer who has communicated with a prospective client shall not use or reveal information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that the lawyer learned as a result of the consultation, except as rule 1.9 would permit with respect to information of a former client." In turn, Business and Professions Code section 6068, subdivision (e)(1), provides it is the duty of an attorney to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Rule 1.6 prohibits a lawyer from "reveal[ing] information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1), unless the client gives informed consent, or the disclosure is permitted by paragraph (b) of this rule." (Rule 1.6(a), fn. omitted.)

Rule 1.18(c) provides: "A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received from the prospective client information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that is material to the matter, except as provided in paragraph (d). If a lawyer is prohibited from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d)." (Rule 1.18(c), asterisks omitted.)

Rule 1.18(d), allows an attorney to represent a party with interest materially adverse to a prospective client when: "(1) both the affected client and the prospective client have given informed written consent, or [¶] (2) the lawyer who received the information took reasonable measures to avoid exposure to more information than was reasonably necessary to determine whether

9

to represent the prospective client; and [¶] (i) the prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and [¶] (ii) written notice is promptly given to the prospective client to enable the prospective client to ascertain compliance with the provisions of this rule." (Rule 1.18(d), asterisks omitted.)

## III. Materiality under Rule 1.18 should be evaluated at the time of disqualification

Frank asserts Rule 1.18 requires courts to evaluate the materiality of confidential information at the time of disqualification. We agree.

To interpret Rule 1.18, we scrutinize the actual words of the rule, giving them a plain and commonsense meaning. (See *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633.) However, "technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, or are defined in the succeeding section, are to be construed according to such peculiar and appropriate meaning or definition." (Civ. Code, § 13.) In analyzing the rule's language, we give meaning to every word and phrase to accomplish a result consistent with the rule's purpose. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 (*Hughes*).)

Rule 1.18 describes materiality in the present tense. Rule 1.18, subdivision (c), reads in relevant part: "A lawyer . . . shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received from the prospective client information . . . that *is* material to the matter . . . ." (*Ibid.*, italics added.) Frank points out that Rule 1.18 uses the present tense,

10

and argues materiality must be evaluated at the time a party moves to disqualify counsel.

The Rules of the State Bar of California, which include the California Rules of Professional Conduct, provide for a liberal approach to the interpretation of specific tenses.  Rule 1.20(A) and (E) of the Rules of the State Bar of California indicate a rule's use of "tense (past, present, or future) includes the others" (Rules of State Bar, tit. 1, div. 3, rule 1.20(A)) and "[a] word or phrase that can have more than one meaning should be interpreted in context" (*id.*, tit. 1, div. 3, rule 1.20(E)).  Thus, while use of verb tense is generally significant in interpreting a statute (*People v. Loeun* (1997) 17 Cal.4th 1, 11; *Hughes*, *supra*, 17 Cal.4th at p. 776), the use of a particular verb tense here is not necessarily determinative.  Rather, in light of the Rules of the State Bar of California's guidance, it appears courts should evaluate whether information was, is, or will be material at the time of disqualification, thereby supporting Frank's assertion that materiality should be evaluated at the time of disqualification.

Further, other authorities appear to recognize the materiality may be affected by subsequent events.  For example, in *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556 (*Zimmerman*), a husband and wife filed for dissolution.  Several years after the dissolution was granted, the wife filed a complaint seeking her share of a community property asset.  The family court granted summary judgment in favor of the husband, but was reversed on appeal after the reviewing court found the asset was a " 'missed asset' " subject to the wife's postdissolution claim. (*Id.* at p. 560.)  On remand, the wife moved to disqualify the husband's attorney based on her contact with a partner at her

husband's attorney's law firm. (*Ibid*.) The wife had contacted the partner, seeking legal representation to oppose the summary judgment motion. This included a 20-minute telephone conversation, during which, the wife "outlined and explained [her] side of the case," describing everything that she thought "was pertinent." (*Ibid*.) At the conclusion of their conversation, the partner provided the wife with "his initial impression and opinion about the case," and recommended that she seek representation by "someone with domestic relations expertise." (*Ibid*.) The family court denied the wife's motion to disqualify, and the wife appealed. (*Id*. at pp. 561, 566.)

The *Zimmerman* court affirmed the order, noting that the subject of the husband's summary judgment motion was no longer material to the matter because it had been finally decided by the prior appeal. (*Zimmerman*, *supra*, 16 Cal.App.4th at p. 565.) The remaining issue, the division and distribution of the missed asset, had little connection to the partner's brief " 'representation' " of the wife. (*Ibid*.) Thus, the *Zimmerman* court found subsequent events in the litigation could render material information immaterial for purposes of disqualification. Therefore, *Zimmerman* supports Frank's assertion that materiality must be evaluated, at least in part, at the time of disqualification.

Likewise, the State Bar opinion cited by Frank also supports his position that information can be subsequently rendered immaterial by subsequent events. Although not binding on courts, formal opinions from the California State Bar may be persuasive authority. (*Coldren v. Hart, King & Coldren, Inc.* (2015) 239 Cal.App.4th 237, 250, fn. 8; *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1113.)

State Bar Formal Opinion No. 2021-205 interpreted Rule 1.18 in the context of various scenarios. The facts common to each scenario are as follows. A potential client consults with a lawyer about retaining the lawyer to prosecute a misappropriation of trade secrets claim against its competitor. The lawyer conducts an interview to determine whether the lawyer can and should represent the potential client. Ultimately, the lawyer does not take on the potential client's case. (State Bar, Formal Opn. No. 2021-205, at p. 2.)

Relevant here, in Scenario 2a, at the outset of the interview, the lawyer advises the potential client that the lawyer has not agreed to represent the potential client and the interview is meant only to determine whether the lawyer or the lawyer's firm would have a conflict of interest in representing the potential client. (State Bar, Formal Opn. No. 2021-205, at p. 3.) The lawyer advises the potential client to limit disclosures to basic facts, such as the identity of the parties and the nature of the claim, necessary to determine whether a conflict of interest would prevent representation. (*Ibid*.) The lawyer further cautions the potential client not to disclose any other confidential information or any information that is not reasonably necessary to assist the lawyer in determining whether there is a conflict since they have not yet formed an attorney-client relationship. (*Ibid*.) The potential client provides the name of the defendant and the subject matter of the lawsuit, but nothing more. (*Ibid*.) The conflict search reveals the prospective client's competitor is an existing client of the lawyer's firm, which is also currently advising the competitor in connection with an upcoming public offering. (*Ibid*.) Accordingly, the lawyer declines to represent the potential client due to the conflict. (*Ibid*.) However, the lawyer

13

also understands that the use or disclosure that the potential client may sue the competitor could materially harm the potential client by alerting the competitor to the threatened litigation.  (*Ibid*.)  On the other hand, the lawyer understands that the prospective suit is material to the competitor since it would disrupt the upcoming public offering.  (*Ibid*.)

The State Bar offered several opinions with respect to the lawyer's duties to the potential client in Scenario 2a.  It found the lawyer "owes a duty to [the potential client] not to use or disclose information received as result of the consultation," noting "case law and prior opinions . . . and local bar committees demonstrate that in such a context, the duty of confidentiality remains paramount so that disclosure to [the] [c]ompetitor is not permitted."  (State Bar, Formal Opn. No. 2021-205 at p. 12.)  However, the State Bar also opined that "[s]hould [the potential client] later sue [the] [c]ompetitor, . . . [l]awyer may be permitted to represent [the] [c]ompetitor against [the] [potential client]."  (*Id*. at p. 13.)  This is because the confidential information the lawyer received from the potential client regarding its intention to sue the competitor "is likely rendered immaterial by the fact that [the] [potential client] has now sued, a fact now known by [the] [c]ompetitor."  (*Ibid*.)

Thus, like *Zimmerman*, the State Bar Formal Opinion No. 2021-205 also supports Frank's position that previously material information can become immaterial to the extent they are no longer confidential because of subsequent events.

Accordingly, in the context of a disqualification motion under Rule 1.18, we hold that courts must evaluate whether the confidential material information disclosed by a prospective client remains material to the present representation.  If it does,

14

disqualification is warranted where no exception under Rule 1.18 applies.

We find this holding consistent with our Supreme Court's guidance to lower courts that judges must examine motions to disqualify "carefully to ensure that literalism does not deny the parties substantial justice" and that these motions should not be a means of tactical abuse. (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144–1145.) By requiring courts to evaluate materiality at the time of the disqualification, parties will be further discouraged from using disqualification motions to gain an unfair advantage over their opponents where a prospective client disclosed once material information that no longer has any bearing on the case.

## IV. Materiality under Rule 1.18

Given our conclusion that materiality should be evaluated at the time of the disqualification, we must decide whether the information shared by Jeffrey remained material despite disclosing the bulk of that information in his petition against Frank. However, before resolving that issue, we must decide between the parties' competing definitions of materiality under Rule 1.18.

On the one hand, Frank argues disqualification under Rule 1.18 is only warranted where the information disclosed by the prospective client to the attorney is materially harmful to the prospective client. On the other hand, Jeffrey argues we should adopt a broader definition of material to mean directly at issue in the case or of critical importance. Notably, there is no California decision that expressly defines materiality under Rule 1.18 although there is indirect support for each party's position.

The only published California decision addressing disqualification under Rule 1.18 is *Syre*, *supra*, 104 Cal.App.5th 280, which was decided while this appeal was pending. The parties submitted supplemental letter briefs on the *Syre* decision.

In *Syre*, the plaintiff sought legal representation to bring an action to quiet title to real property against defendant. She contacted California Indian Legal Services (CILS), a public law office that provides legal services to qualified individuals. (*Syre, supra*, 104 Cal.App.5th at pp. 287–290.) The plaintiff "called CILS's office and spoke to an intake advocate, a person who is not an attorney, and whose primary duties include answering the telephone." (*Id*. at pp. 289–290.) The intake advocate's responsibilities included screening potential clients as CILS generally did not represent clients who owned real property in title disputes, or who resided outside of CILS's serviced area. (*Id*. at p. 290.) The intake advocate was "trained to inform prospective clients that their case cannot be accepted unless and until their issue has been discussed at a 'Case Acceptance Meeting.' " (*Ibid*.)

Because CILS's case management system did not have a record of its contact with the plaintiff and the plaintiff never spoke with a CILS attorney, the substance of the intake advocate's conversation with the plaintiff was derived from a subsequent e-mail exchange between the intake advocate and a CILS attorney. (*Syre, supra*, 104 Cal.App.5th at p. 291.) In the e-mail exchange, the intake advocate wrote: " 'She grew up in Bishop . . . and had an aunt that owned a house. She bought the house from her aunt before her [a]unt . . . died, so told her [a]unt that she could live in the house for as long as she wants. Her relative [the defendant] forced their aunt into signing the deed

16

which would make [defendant] co-owner with [plaintiff]. The defendant is in Inyo County jail right now; he's a felon and was arrested for being in possession of firearms and drugs (4 counts total). She is coming to Bishop and has talked to the Sheriff about a restraining order because she is afraid of him. He also forced the [a]unt to take her name off of her trust and put it into his name. The [a]unt was supposed to go to the Care Center but died prior to going. She didn't have a caregiver but there were people that looked in on her. [¶] She owns a house in Tustin, CA and the [m]ortgage payments are $3200 . . . per month; she has no income right now and was getting a grant to pay her mortgage payments. She has $20,000 in her checking about [*sic*] which won't last long. She has car payment of $832 per month which was also being subsidized by the state. [¶] I believe she would be eligible for a CAT 6a." (*Id*., at pp. 291–292.) The e-mail exchange reflects that CILS declined representation because the plaintiff lived outside CILS's serviced area and because she was trying to prove that her aunt changed documents "due to undue influence, which was an uphill battle." (*Id*. at p. 292.)

Approximately one year later, the plaintiff sued the defendant, who retained CILS to defend the lawsuit. (*Syre*, *supra*, 104 Cal.App.5th at p. 289.) The plaintiff moved to disqualify CILS under Rule 1.18, alleging that CILS had a conflict of interest stemming from the plaintiff's attempt to obtain legal representation. (*Syre*, at p. 289.) The trial court denied the motion, and the plaintiff appealed. (*Ibid*.)

In affirming the trial court's order, the *Syre* court noted that the plaintiff never spoke with an attorney and that the intake advocate informed the plaintiff that CILS would not take her case until the issue had been discussed at the Case

17

Acceptance Meeting.  (*Syre*, *supra*, 104 Cal.App.5th at p. 297.)
"Thus, plaintiff was aware that obtaining representation by CILS
required the communication of preliminary information about the
'issue' to determine if the case was appropriate under the CILS
grants."  (*Id*. at pp. 297–298.)  "[T]he only information
communicated by plaintiff to the CILS intake advocate that could
be viewed as confidential would have been her financial
information, needed to determine her eligibility for
representation.  However, the communication of that information
was necessary to determine if she was eligible for the services of
CILS in the first place, and there is no evidence it was
communicated to a third party or made public."  (*Id*. at p. 298.)

"As to the remaining information communicated to CILS,
the case information provided by plaintiff was preliminary
information about the nature of the dispute (whether defendant
exercised undue influence on [the aunt] to induce her to convey
her real and personal property to him (who was the natural
object of her bounty).  In this regard, matters of title to real
property are public record and all the transfers referred to in the
complaint and cross-complaint involve records that were either
recorded or notarized in front of witnesses, and were matters of
public record.  [Citation.]  As for the information regarding
plaintiff's statements that defendant exercised undue influence
on [the aunt], that information could not be viewed as
confidential where it related to the theory of recovery she
intended to pursue, and which would have been disclosed in the
pleadings.  The case-related information was not confidential, did
not risk any harm to plaintiff, and was not material to her action
to quiet title, although some of the information was, in fact,
included in her quiet title action."  (*Syre*, *supra*, 104 Cal.App.5th

18

at p. 298.) "[I]t cannot be said that the information that was communicated to the intake advocate, as relayed to those responsible for the decision whether or not to accept plaintiff's case, was confidential in nature, much less harmful to plaintiff. Plaintiff relayed to the intake advocate her concerns that defendant had exercised undue influence on [the aunt], which, it turned out, was the same concern independently entertained by CILS when consulted by defendant, prior to the public law firm's acceptance of his case." (*Ibid*.)

"We cannot consider communication of the nature of plaintiff's anticipated action against defendant to be confidential information where plaintiff was seeking representation in anticipation of filing a lawsuit based on that information in court. Plaintiff's cause of action alleges that any transfer of the title to the property in question is 'void ab initio' without referring to any deed in favor of defendant, while also alleging that defendant is an ex-felon whose testimony in court would be subject to impeachment. It does not require prescience to predict that the basis of these allegations would be explored in discovery in this litigation. Plaintiff cannot reasonably assert that the preliminary information about the 'issue' in the case was a confidential communication." (*Syre, supra*, 104 Cal.App.5th at p. 299.)

While the *Syre* court never explicitly does so, it is apparent from its reasoning that it adopted a definition of materiality more akin to what Frank argues here, i.e., "material to the matter" under Rule 1.18 means materially harmful. In finding the trial court did not abuse its discretion in denying the motion to disqualify, the court concluded the information disclosed by the

19

plaintiff to the intake advocate would not "[harm the plaintiff] in any way." (*Syre,* supra, 104 Cal.App.5th at p. 301.)

The *Syre* court's implicit definition of material appears to be consistent with the State Bar opinion referenced above. To recap, in Scenario 2a, the State Bar opined that the lawyer may not necessarily be prohibited from representing the competitor in litigation against the potential client. There, the confidential information that the lawyer received from the potential client concerning its intention to sue the competitor is likely rendered immaterial when the potential client has sued, a fact now known to the competitor. (State Bar, Formal Opn. No. 2021-205 at p. 13.) However, the State Bar opinion offered several caveats to the lawyer's potential representation of the competitor. First, it noted that the lawyer could be potentially prohibited from undertaking the representation if "some aspect of the initial consultation" with the lawyer, "such as its timing, remain[ed] material." (*Ibid.*) It also gave examples of how the consultation's timing could be material for a statute of limitations or laches defense, which would turn on when the potential client discovered the existence of a claim. (*Id.* at p. 13, fn. 13.) Thus, as the State Bar plainly acknowledges, certain information surrounding the potential client's intention to sue could remain material even after the potential client has filed suit, as it could be harmful to either the potential client if the information were to be disclosed to the competitor, or harmful to the competitor if the attorney were forced to sit on the information in a subsequent suit between the two.

Given the outcome in *Syre* as well as the State Bar opinion, we hold that materiality in the context of a disqualification motion under Rule 1.18 means materially harmful.

20

The authority cited by Jeffrey that support his definition of materiality, that is, "material to the matter" means directly at issue or of critical importance, does not convince us that potential harm is not a component of evaluating materiality in the context of a disqualification motion.

In *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671 (*Farris*), the court described material information in the context of a disqualification motion as information that is "directly in issue" or having some "critical importance" to the representation. (*Id.* at p. 680.) *Farris* involved a motion to disqualify counsel for successive representations where the plaintiffs sued their insurer for breach of an insurance contract and alleged bad faith. (*Id.* at p. 676.) The insurer moved to disqualify plaintiffs' counsel on the grounds it was a former client when plaintiffs' counsel was working as coverage counsel at a prior law firm. (*Ibid.*) In opposing the disqualification motion, plaintiffs' counsel admitted he had represented the insurer and, in that capacity, discussed settlement, litigation and claims, oversaw strategies in connection with coverage matters, and participated in confidential communications with the insurer's top-level employees. He also admitted that to do his job properly, he was required to have thorough knowledge of the insurer's policies and procedures with respect to policy interpretations and coverage positions. (*Id.* at p. 677.) Nevertheless, plaintiffs' counsel said, "the bulk of his work" had been "issuing coverage opinions, which he said consisted of applying the facts and circumstances of a case to the particular terms and provisions of the policy in issue." (*Id.* at pp. 677–678.) Essentially, plaintiffs' counsel claimed disqualification was unwarranted because his prior work for the

21

insurer involved " 'very factual and legally specific' " analysis, and that he had no knowledge about the insurer that would be of any present value to him in handling the litigation. (*Id*. at p. 678.)

In finding disqualification was appropriate, the *Farris* court explained that " 'when ruling upon a disqualification motion in a successive representation case, the trial court must first identify where the attorney's former representation placed the attorney with respect to the prior client.' " (*Farris*, *supra*, 119 Cal.App.4th at pp. 678–679.) " 'If the court determines that the placement was direct and personal . . . the only remaining question is whether there is a connection between the two successive representations, a study that may not include an "inquiry into the actual state of the lawyer's knowledge" acquired during the lawyers' representation of the former client.' " (*Id*. at p. 679.) "Successive representations will be substantially related 'when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also *material* to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.' " (*Ibid*., italics added.)

In describing materiality in the context of disqualification for successive representations, the *Farris* court stated, "[t]o create a conflict requiring disqualification, . . . the information acquired during the first representation [must] be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation." (*Farris*, *supra*, 119 Cal.App.4th at p. 680, citing *Jessen v.*

*Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 712–713.) *Farris* explained the materiality element as similar to that found in section 132 of the Restatement (Third) of the Law Governing Lawyers, which states "there exists a 'substantial risk' the present representation will involve the use of information acquired during the prior representation 'where it is reasonable to conclude that it would *materially* advance the [present] client's position in the subsequent matter to use confidential information obtained in the prior representation.' " (*Farris*, at p. 681, italics in original.) *Farris* stated the "critical concern" is the attorney's possession of confidential information acquired during the first representation " 'that could be used to *adverse effect* in the subsequent representation.' " (*Ibid.*, italics added.)

Thus, although *Farris* considers disqualification in a different context, its definition of materiality as "directly at issue in, or have some critical importance to" the current representation also includes an element of harm that must be met before disqualification is warranted. Similarly here, we conclude the disclosed information must meet the additional element of materially harmful for disqualification to be warranted under Rule 1.18.

## V. The information disclosed to Streisand was material at the time of disqualification

Given our conclusion that "material to the matter" under Rule 1.18 includes an element of harm, we must decide whether the information disclosed to Streisand met that standard. We conclude that it does.

Jeffrey disclosed not only his intention to sue Frank, but also his theory of the case along with specific statements and documents supporting that theory. Jeffrey, either directly or

23

through Jeremy, shared "his specific understanding of the case . . . and his mental impressions on Vera's health and Frank's influence." He supported that theory with his own statements as well as a document evidencing Frank's alleged misconduct. This evidence is at the heart of Jeffrey's petition and the basis for the allegations that Frank exercised improper influence over Vera with respect to the trusts in light of Vera's declining health.

Nevertheless, Frank asserts we should reverse the trial court's disqualification of Streisand and his firm because Jeffrey only disclosed information related to the nature of the dispute. Frank argues, like *Syre*, the information conveyed consisted primarily of the identity of the parties and trust in dispute, along with allegations that Frank unduly influenced the settlor, i.e., Jeffrey revealed information conveyed that was eventually included in publicly filed pleadings or would be revealed in discovery.

We find that Jeffrey's disclosures went beyond the "preliminary information" about the " 'issue' in the case." (*Syre, supra*, 104 Cal.App.5th at p. 299.) In addition to conveying to Streisand the identities of the parties and the allegations that Frank unduly influenced Vera, Jeffrey also conveyed information that was not included in his petition that was both confidential and material. We are particularly troubled by Jeffrey's disclosure of a document sent by Frank to Jeffrey and ultimately shared with Streisand. Although Jeffrey's petition alleged Frank tried to contact him "to move forward with installing Frank as sole Trustee of the 2004 Trust," the document sent in the e-mail exchange was not attached to Jeffrey's petition. We are not persuaded by Frank's argument that this document is not at issue because it was not referenced in Jeffrey's petition. While

24

the document may not be directly contested, it may be proof of the claims made in Jeffrey's petition as well as Frank's objections over the alleged scheme by Frank to exercise control over trust assets. Here, Jeffrey provided Streisand with his view of what the trust was meant to accomplish as well.

We are also concerned with Jeffrey's statements in the e-mail exchange regarding Vera's health. Notably, the petition never alleges the specific health concerns that Jeffrey shared in his e-mails with Streisand. Rather, it alleges: "Vera's family (Frank included) observed that Vera's health declined considerably after her husband's death in 2018. She was not the vibrant and energetic woman she had once been and spent the vast majority of her time at home with a caretaker. She was forgetful and grew increasingly listless and hard of hearing. She was incapable of reading anything complex." "Following Sam's death in February 2018, Vera's family no longer trusted her to take care of her own financial affairs. For example, in or around 2018, a stranger sent a letter to Vera asking for money and claiming to be a relative. Vera was preparing to write a significant check to the individual until she was caught by family members. At that point, Frank himself took away her checkbook." The petition also generally alleges Vera was "mentally incapacitated," and subject to "undue influence" and "declining health." Thus, Jeffrey's petition never alleges the exact basis for his belief that Vera was subject to undue influence or lacked capacity whereas the e-mails have more specific information. We find this information constitutes confidential material information as undue influence over Vera and her mental capacity are directly at issue.

Moreover, we are not persuaded by the *Syre* court's suggestion that information which may later be explored in discovery does not constitute materially harmful information to the prospective client. (See *Syre, supra*, 104 Cal.App.5th at p. 299.) Rather, we find that the preliminary disclosure of certain information by a prospective client could give the opposing side an advantage in discovery. For example, here, Frank can use the document disclosed by Jeffrey during his consultation with Streisand to obtain additional information that might not necessarily be available as it was never disclosed in the pleadings. Frank could also use Jeffrey's claim about Vera's health to obtain additional information regarding that statement, which again, was not disclosed in the pleading. Further, there is also a scenario where Jeffrey could subsequently contradict his statements to Streisand. In that scenario, Streisand would either become a witness for Frank or would have to withhold the information to avoid violating his duty of confidentiality owed to Jeffrey as a prospective client.

We therefore conclude the information Jeffrey disclosed to Streisand was material for purposes of disqualification under Rule 1.18.

## VI. The probate court evaluated materiality at the time of disqualification

With respect to Frank's second argument—that the probate court failed to consider whether the information remained material at the time of disqualification—it is apparent from the probate court's ruling that it conducted the required analysis. This is reflected in the probate court's discussion of how the timing of the March 2021 e-mail exchange could become relevant in discovery if the parties dispute when certain facts were known

to either Jeffrey or Jeremy or somebody else in their family. As stated above, Streisand would have to refrain from using that information if Jeffrey or Jeremy contradicted their prior statements. Restricting Streisand's use of this information would effectively prevent Streisand from vigorously advocating for his current client, Frank. In light of these considerations, we conclude the probate court correctly evaluated whether the information disclosed by Jeffrey was material at the time he moved to disqualify Streisand and Sheppard Mullin.

## VII.  The equities do not warrant reversal

Frank also argues the equities do not warrant disqualification. We disagree.

"When deciding a motion to disqualify counsel, '[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.' [Citations.] '[W]here an attorney's continued representation threatens an opposing litigant with cognizable injury or would undermine the integrity of the judicial process, the trial court may grant a motion for disqualification, regardless of whether a motion is brought by a present or former client of recused counsel.' " (*Militello v. VFARM 1509* (2023) 89 Cal.App.5th 602, 612–613.)

While "preservation of the public trust is a policy consideration of the highest order. . . . it is *just one* of the many policy interests which must be balanced by a trial court considering a disqualification motion . . . ." (*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 807.) Other policy considerations include: "(1) a client's right to chosen

27

counsel; (2) an attorney's interest in representing a client; (3) the financial burden on a client to replace disqualified counsel; (4) the possibility that tactical abuse underlies the disqualification motion; (5) the need to maintain ethical standards of professional responsibility; and (6) the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." (*Id.* at pp. 807–808, citing *SpeeDee Oil, supra*, 20 Cal.4th at pp. 1144–1145.)

Frank makes several arguments as to why the equities weigh in his favor here. He asserts there is no indication the integrity of the judicial process will be injured if Streisand continues to represent him. As stated above, however, the probate court correctly identified issues with the March 2021 e-mail exchange that could impact the integrity of the judicial process. These included Streisand's ability to vigorously advocate for Frank if any of the topics discussed in the March 2021 e-mail exchange become the subject of discovery. This is especially true here because the e-mail topics are directly at issue in the ligation.

Frank also asserts the equities weigh in his favor as Streisand did not initially evaluate a potential conflict because Jeremy responded with a list of interested parties that omitted Frank. Further, he points out that neither Jeffrey nor Jeremy provided Streisand with the trust instrument, which is essential to conducting a conflict check in a trust case. We are unsure why these particular facts weigh in favor of Frank or against disqualification here. As the State Bar's opinion explains, under Rule 1.18, the burden is on the attorney to ensure the prospective client shares only as much information as necessary to conduct a conflicts check and nothing more. It is the attorney, not the prospective client, who must ensure compliance with the rules.

Frank also notes that, as soon as Streisand understood that Frank was adverse to Jeffrey, he did a second conflicts check that included Frank's name, and promptly informed Jeffrey there was conflict. Again, we are unsure how this fact weighs in favor of Frank or against disqualification. As discussed above, Jeffrey, either directly or through Jeremy, shared confidential material information with Streisand. It is not the length of the initial consultation that is determinative; rather, it is whether material confidences were disclosed. (See *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1151.)

Frank also indicates that there was no evidence suggesting Streisand communicated with Jeffrey and Jeremy to obtain an unfair advantage for Frank. While a willful attempt to obtain an unfair advantage in the litigation would certainly make things worse, potential disqualification is not only meant to " 'prevent [a] dishonest [lawyer] from fraudulent conduct,' but also to keep honest attorneys from having to choose between conflicting duties, or being tempted to reconcile conflicting interests, rather than fully pursuing their clients' rights." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1147 [recognizing that an attorney's actual intention and motives are immaterial where the rule of automatic disqualification applies].)

Last, Frank argues, the information that Jeffrey and Jeremy disclosed to Streisand was basic, e.g., their allegations that Frank unduly influenced Vera to sign a trust amendment at a time when she lacked capacity. While this is true, the information went beyond what was necessary for Streisand to check for conflicts. Further, the test is not whether the information shared by the prospective client was basic or comprehensive. Rather, the test is whether the client shared

confidential material information with the attorney.  (See *Syre*, *supra*, 104 Cal.App.5th at p. 301.)

Because confidential material information was shared with Streisand, which could lead to further issues down the road, we find disqualification here will maintain ethical standards of professional responsibility and preserve the scrupulous administration of justice and the integrity of the bar.  (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144–1145.)  Moreover, since this case is still at its inception, we find the remainder of the equities weigh in favor of disqualification, those being Frank's right to chosen counsel, Streisand's interest in representing Frank, the financial burden on Frank to replace Streisand, and the lack of any possibility that tactical abuse underlies Jeffrey's disqualification motion.  (*Ibid.*)

## DISPOSITION

The order is affirmed.  Respondent is awarded his costs on appeal.



VIRAMONTES, J.



WE CONCUR:



GRIMES, Acting P. J.



WILEY, J.



30